CASSON, Administrator, Respondent, vs. SCHOENFELD and
another, Appellants.

*November 13, 1917—January 5, 1918.*

*Deceit: Exchange of properties induced by false representations:
    Special verdict: Sufficiency: Contracts: Mental incompetency of
    party: Fraud: Evidence: Witnesses: Competency: Transactions
    with decedent: Husband and wife: Physicians and surgeons: Dis-
    closure of information: Public officials: Waiver of privilege: Ex-
    pert testimony: Appeal: Prejudicial errors.*

1. The special verdict in this case, on its face, is *held* sufficient to
    warrant a judgment against one of the defendants, but not the
    other, on the ground that by false representations, made by said
    first mentioned defendant, as to the character and value of land
    in North Dakota plaintiff's intestate was induced, to his damage,
    to transfer a stock of goods to said defendant in exchange for
    said land.
2. Persons who knew or ought to have known that another was so
    mentally deranged as to be incompetent to transact business

and, taking advantage of such incompetency, induced him to make an exchange of properties to his injury, were guilty of a fraud and are liable to respond therefor in damages.

3. The question being whether plaintiff's intestate was mentally incompetent to transact business at the time he made an exchange of properties, members of his family were not incompetent, under sec. 4069, Stats., to testify to conduct on his part, prior to the exchange, from which an inference that he was deranged might well be drawn, where the matters of observation so testified to were wholly unparticipated in and uninfluenced by them; nor did such testimony by the wife violate sec. 4072, where nothing in the nature of a confidential communication was disclosed.

4. But the testimony above mentioned would not be admissible upon the question whether defendants (who negotiated the exchange) knew or ought to have known of the decedent's mental condition, without proof that the facts so testified to were known to defendants or were of such a nature that they must have been known to them.

5. A public official who, as a physician or surgeon, acquires information concerning a patient committed to his care or to him for examination in order that he may be able to determine what treatment should be had or whether any treatment is possible tending to cure or benefit that patient, may not, under sec. 4075, Stats., be permitted to give such information to any one unless by consent of the patient; and the fact that a public record is required to be kept by such physician or the institution with which he is connected does not affect the rule.

6. The provision of the statute prohibiting disclosure of such information can be waived by the patient only, and not by any one after his death.

7. The error, in this case, of permitting the examining physician at the state hospital for the insane to testify as to results of his personal examination of plaintiff's decedent at the time of his commitment to said hospital, is *held* to have been prejudicial to defendants, since it must have had great weight with the jury in determining the questions as to the nature and extent of decedent's mental incompetency and whether defendants ought to have known thereof, and also the question whether the decedent relied upon any false representations which defendants might be found to have made in the negotiations for exchange of properties.

8. It was error, also, to permit physicians to testify in effect, in reply to hypothetical questions, that in their judgment persons of ordinary intelligence and prudence, situated as the defendants

were, should have known that the decedent was mentally in-
competent to transact business.

9. What impression a given state of facts would make upon the or-
dinary individual is a question to be answered by the jury, and
is not a proper subject for expert testimony.

APPEALS from a judgment of the circuit court for Iowa
county: GEORGE CLEMENTSON, Circuit Judge. *Reversed.*

Action to recover damages alleged to have been sustained
by plaintiff's decedent by reason of ꞏfraudulent representa-
tions, made by defendants, whereby said decedent was in-
duced to exchange a stock of goods for 480 acres of land in
Mercer county, North Dakota, at a time when, it is alleged,
he was of unsound mind and incompetent to transact business.

One Max Brickman, now deceased, and for whose estate
the plaintiff was appointed special administrator after the
commencement of the action, conducted a general store at
Linden, Wisconsin. The defendant *Schoenfeld* was a min-
ister at Dodgeville, Wisconsin, dealing to some extent in real
estate also, particularly lands in North Dakota, and at the
time in question had an option or right to sell a farm of 480
acres in Mercer county in that state, owned by one Stewart.
The defendant *Elliott* was a merchant at Richland Center,
Wisconsin, and engaged in selling real estate, and owned an-
other 480 acres in Billings county, North Dakota, about
seventy miles from the tract in Mercer county. *Elliott* met
Brickman through one Sullivan, a real-estate agent living at
Lone Rock, Wisconsin, and a meeting was had between
*Elliott* and Brickman at Linden to discuss a trade of the
North Dakota land for Brickman's store. *Elliott* knew that
defendant *Schoenfeld* had this option on the Mercer county
lands at the time. An arrangement was made between
*Elliott* and Brickman whereby Sullivan was to accompany
Brickman to inspect lands in Dakota proposed to be traded,
and on September 20th, while on the way and at Madison,
they met defendant *Schoenfeld,* who was then intending to

visit other lands in North Dakota than either of these two tracts. It was then arranged that *Schoenfeld* should accompany Brickman instead of Sullivan. It was understood as between the two defendants that in case Brickman was not satisfied with the Billings county land belonging to *Elliott* the tract in Mercer county might be used for the purpose of an exchange. *Schoenfeld* and Brickman went to Hebron, North Dakota, and at that place *Schoenfeld* had one Barker take Brickman to see the land in Mercer county at a distance from Hebron of about forty miles, and on this trip Brickman did not see the Billings county land owned by *Elliott*. *Schoenfeld* and Brickman were on the train together on their return trip, which was about September 25th.

On the return a written contract was made, which was not produced by either party on the trial, and dated September 26th, purporting to be between *Elliott* and Brickman, for the exchange of the store property at Linden for the farm in Mercer county. There is a dispute between the parties as to whether this contract was written out by *Schoenfeld* at Madison on the way back or at the Brickman store in Linden one or two days after such return.

On October 8th the parties again met, and it is uncontradicted that a further written agreement was made out by *Schoenfeld* and signed by Brickman and *Elliott*, arranging for the taking of an invoice of the stock of goods at the Linden store, and such invoice was taken, and there is no dispute as to the amount thereof, and such amount was the basis for the judgment for damages entered by the court upon the special verdict.

The material parts of the special verdict of thirteen questions were: that before the transfer was made *Elliott* told Brickman that the 480 acres of land *Elliott* owned in North Dakota was worth at least $25 an acre, was black loam soil and free from stone; that such representations induced Brickman to go to North Dakota with defendant *Schoenfeld* to

look at said 480 acres with a view of entering into the trade; that such representations were relied upon and were the inducement to Brickman to exchange his stock of goods for the 480 acres of land and to assume the payment of a $3,000 mortgage thereon; that defendant *Schoenfeld* did not make statements concerning the character of the land similar to those the jury found that *Elliott* made; that *Schoenfeld* in what he did to promote the trade of the 480 acres of land for Brickman's store was acting as an agent of *Elliott* and in his own interest.

By the tenth question of the special verdict the jury found that at the time Brickman entered into the contract of exchange he was mentally deranged. By the eleventh, that when Brickman transferred his stock of goods he was not of sufficient mental ability to know what he was doing and the nature of the act done, and did not have ability to exercise reasonable judgment in regard to such act. (To this finding defendants filed no exception or any motion to set aside the same.)

By the twelfth and thirteenth questions they found respectively that *Elliott* and *Schoenfeld* at the time of the trade knew, or as men of ordinary intelligence, observation, and prudence should have known, that at the time the trade was negotiated and carried out Brickman was mentally deranged and not of sufficient mental ability to exercise reasonable judgment in regard to such trade.

The jury also found that the representations as to the kind of soil and the value of the land were not true and that the land was worth but $15 an acre, and that the market value of the stock of goods was the invoice price.

After motions by both parties the court ordered judgment in favor of the plaintiff for $5,691 and costs against the two defendants, from which judgment each of the defendants appeals to this court.

For the appellants there was a brief by *Jeffris, Mouat,*

*Oestreich & Avery* of Janesville, and oral argument by *O. A. Oestreich.*

For the respondent the cause was submitted on the brief of *Hill & Spohn* of Madison.

ESCHWEILER, J.   The appellant *Schoenfeld* contends that there was no evidence to support a judgment against him. The two defendants contend that the court erred in admitting evidence and in assessing the measure of damages, or erred in refusing to grant a new trial.

There is no way of determining from the record herein, including the decision of the trial court in passing upon the motions made after verdict, whether the judgment is entered against the defendants on the theory that the plaintiff was entitled to recover on the ground of false representations, which may be considered as one cause of action, or because the stock of goods was obtained from Brickman by the defendants at a time when Brickman was mentally incompetent to transact the business, and when such condition was known or ought to have been known by the defendants, and they taking advantage of such condition, which may be considered as a second cause of action. It would appear from the respondent's brief on appeal that he apparently relies in support of this judgment on the theory of such second cause of action.

Upon the face of the verdict as it stands a judgment could be properly entered against the defendant *Elliott* on the ground that by reason of his false representations as to the character and the value of the land conveyed to Brickman the latter was induced, and to his damage, to transfer his stock of goods to *Elliott*. The jury, however, have expressly acquitted the defendant *Schoenfeld* of making representations similar to those which they find the defendant *Elliott* made concerning the land. This would necessarily prevent entering a judgment against the defendant *Schoenfeld* on

the ground of any false representations inducing the contract, unless such a judgment could be supported by the finding that what *Schoenfeld* did in inducing the trade by Brickman was done in his own interest and as agent for *Elliott*. There is no finding, however, and no expression by the trial court to the effect that he found that *Schoenfeld* knew that *Elliott* had made any representations to Brickman concerning this land, and manifestly, unless he did know that fraud had been practiced by *Elliott* in representing this land to Brickman, the mere fact that he acted as agent in such transfer would not be sufficient to make him liable with *Elliott* on the ground of false representations. There is testimony to the effect, by members of Brickman's family, that *Schoenfeld* was present at one or more interviews between Brickman and *Elliott* before the day on which the contract to make an inventory of the goods was made on October 8th, and that on one or more of such prior visits *Schoenfeld* also made similar representations as to the value and nature of the 480-acre tract. But both *Schoenfeld* and *Elliott* deny that *Schoenfeld* was present prior to October 8th at any interview between *Elliott* and Brickman at Linden, where the members of the family claim such representations were made by *Schoenfeld*. The jury have expressly found in their answer to the fourth question that the testimony of the defendants was true as to there being no representations made by *Schoenfeld*. This, therefore, fairly construed, should be held a determination in defendant *Schoenfeld's* favor of the question as to whether *Schoenfeld* was present at those prior meetings and therefore chargeable with knowing of *Elliott's* representations, because such actual presence there before October 8th is necessarily involved, as the testimony stands herein, in the determination of that fourth question of the verdict. There is no other view of the evidence in the record which would support a finding, or warrant this court in assuming under sec. 2858m, Stats., a finding that *Schoenfeld*

knew or ought to have known that Brickman was induced to make this trade by virtue of any false representations made by *Elliott* concerning the land, and consequently there is no support for upholding the judgment against *Schoenfeld* on the basis that he is liable as for false representations.

If, however, defendants knew or ought to have known, at the time of the exchange by which *Elliott* got the stock of goods in October, 1910, from Max Brickman, that Brickman was so mentally deranged as to be incompetent to transact such business, they could nevertheless be held to have participated in a fraud upon him by taking advantage of that condition and for that they could be required to respond in damages. *Encking v. Simmons,* 28 Wis. 272; *Halley v. Troester,* 72 Mo. 73; *Creekmore v. Baxter,* 121 N. C. 31, 27 S. E. 994; *Crawford v. Scovell,* 94 Pa. St. 48, 39 Am. Rep. 766; 12 Ruling Case Law, 585; 22 Cyc. 1205.

If there was no material error committed on the trial amounting to substantial prejudice to the rights of the defendants in the admission or rejection of testimony, it would be our duty to sustain this judgment on what might be considered this second cause of action for such fraud perpetrated by defendants in so taking advantage of Brickman's incompetency to their benefit or his harm. The defendants, however, now insist on three grounds, each claimed to be a substantial prejudicial error occurring on the trial; first, the admission by the court of the testimony of the widow and children of Max Brickman as to his conduct and appearance indicating mental incompetency and derangement at and prior to the time of the exchange of property; second, the admission, over objection, of the testimony of Dr. Lorenz of the state hospital for the insane at Mendota, to which institution Brickman was committed November 17th following the exchange of property; and third, as to a hypothetical question propounded to and permitted to be answered by Dr. Lorenz and Dr. Green as medical experts as to whether,

under the facts stated in such question purporting to relate the condition of Brickman, a person of average intelligence and prudence situated towards him as were *Elliott* and *Schoenfeld* should have known that Brickman was not in a mental condition to understand business or business dealings.

On the first question thus raised we are satisfied that the ruling of the trial court in admitting the evidence of the members of the family of the deceased was proper and cannot be disturbed. They were permitted to testify as to what they saw in the conduct of Brickman prior to this exchange, and from such conduct the inference might well have been drawn that he was deranged. Such testimony did not either call for transactions between such witnesses and the deceased which could be excluded under sec. 4069, Stats., nor did it call for a violation of the provisions of sec. 4072, which prevents either husband or wife disclosing confidential communications.

The matters of observation thus called for were substantially all of such a nature as were wholly unparticipated in and uninfluenced by them, and were not, as to the wife, anything in the nature of a confidential communication, and such evidence was properly admitted under the rule in *Schultz v. Culbertson,* 125 Wis. 169, 172, 103 N. W. 234; *Burnham v. Mitchell,* 34 Wis. 117, 133.

It should be noted, however, that such testimony, although admissible as to the question of Max Brickman's mental competency, would not necessarily be admissible on the questions whether defendants knew or ought to have known of any incompetent condition that might be found to exist, without proof that the facts so testified to were either known to defendants or were of such a nature that they must have been known to them.

The second question, as to whether Dr. Lorenz, the examining physician of the male patients who were committed to the state hospital for the insane at Mendota, might prop-

erly be permitted to testify as to results of his personal examination of Max Brickman at the time of his commitment, involves the consideration of sec. 4075, Stats., which reads as follows:

"No person duly authorized to practice physic or surgery shall be permitted to disclose any information which he may have acquired in attending any patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician or to do any act for him as a surgeon; but as a witness in his own behalf, he may disclose such information in any civil action brought by such patient or his legal representatives to recover damages for malpractice in such professional attendance, and also in any criminal prosecution for such malpractice, whenever such patient or his legal representatives shall have first given evidence relating to such information."

The language is broad and absolute. Such a statute has been declared to be for the benefit of the patient; that matters learned in the confidential and sacred relationship that exists between patient and physician shall not be revealed to any third person except with the express consent or waiver of the patient himself. It is to protect him, or his memory, from possible shame and disgrace. *Boyle v. Northwestern Mut. R. Asso.* 95 Wis. 312, 322, 70 N. W. 351; *Will of Hunt,* 122 Wis. 460, 467, 100 N. W. 874; *Davis v. Supreme Lodge Knights of Honor,* 165 N. Y. 159, 163, 58 N. E. 891.

It is essential, nevertheless, that the examination and information disclosed, to be protected from disclosure, shall be obtained in order that the physician may treat, cure, or alleviate the condition of the patient. And where the examination is solely for the purpose of determining the question of an individual's mental competency with a view to an application for her release from guardianship and where it was beyond question not for the purpose of curing or helping her, the ban of the statute does not exist. *Will of Bruendl,* 102 Wis. 45, 48, 78 N. W. 169, so much relied upon in this case

by plaintiff. Where the physician was permitted to testify as to the result of his examination, when it was solely for the purpose of determining whether or not such person had a venereal disease in order to permit testimony in respect to that to be given in a criminal case in which the person so examined was claimed to have been assaulted by the defendant and where clearly the examination was not for the purpose of prescribing, his testimony was properly received. *James v. State,* 124 Wis. 130, 102 N. W. 320.

Under the Code of the state of New York, sec. 834, which is substantially the same as our sec. 4075 except that the word "allowed" is used instead of the word "permitted," a physician who attended a person who had taken poison, although not called for by such person and indeed ordered away by the patient, who refused his services, yet in fact did nevertheless attend and treat the patient and learned of the fact of the taking of the poison, was not allowed to testify. *Meyer v. Supreme Lodge, K. of P.* 178 N. Y. 63, 70 N. E. 111.

By sec. 561q, Stats., the duties of superintendent of such a hospital for the insane are specified, and among the duties prescribed it is provided that such superintendent shall be responsible for the care, health, and treatment of the inmates; shall cause to be kept a daily record of each inmate and report monthly to the state board of control the name of each patient during the preceding month with a brief statement of his or her mental and physical condition and form of insanity. Dr. Lorenz, the one examined, although not the superintendent, was in charge of the male patients of the institution, and all examinations of such patients were made by him and a report was made by him or under his direction of such examination.

Over objection he was permitted to disclose that from the physical examination and the test made of the spinal fluid of Brickman he ascertained that Brickman was suffering

from a disease of the brain induced by a serious affliction and that must have been of ten to twelve years' standing; that from the nature of such disease and the condition he then found him in, Brickman must have been deranged and incompetent to transact business affairs for a year at least prior to the transaction in question.

We see no reason why sec. 4075 does not squarely meet this situation and exclude the testimony of one situated as was Dr. Lorenz and prohibit him from giving such information as he did, being the result of his examination, just as well as though he had been called in as a private physician to treat Brickman. It was, as he said on his examination, part of his duty to classify the inmates, study their insanity, the cause of it, and their condition to determine whether they are treatable and recoverable and what kind of treatment they are to receive, if any. Even were there no such testimony here it is manifest that the commitment of individuals to such institution is for the purpose of treatment and care, and the present high standard of such institutions could not be upheld and maintained if the sole purpose and object of them was to merely detain such patients and not give them care and treatment tending to alleviate, if possible, their unfortunate condition. Almost this precise question has been passed upon by this court in the case of *Mehegan v. Faber,* 158 Wis. 645, 149 N. W. 397, where the records kept by the superintendent of the Wisconsin tuberculosis sanitarium were held to be properly excluded under this sec. 4075, Stats. The same rule is recognized in *Mass. Mut. L. Ins. Co. v. Board of Trustees,* 178 Mich. 193, 144 N. W. 538, 51 L. R. A. n. s. 22; *Smart v. Kansas City,* 208 Mo. 162, 105 S. W. 709, 14 L. R. A. n. s. 565; Jones, Evidence (4 Horwitz, Comm.) 759, 760a.

We therefore hold that the public official who, as a physician or surgeon, learns in that capacity information concerning a patient committed to his care or to him for examina-

tion in order that such physician or surgeon may be able to determine what treatment, if any, should be had or whether any treatment is possible tending to cure, benefit, or alleviate that patient, shall not be permitted to give such information to any one unless by consent of the patient.

That a public record is required to be kept by such physician or institution does not affect the rule. A legislative provision for the filing of certain documents as public reports by physicians is not a legislative declaration that the secrecy of sec. 4075 as to physicians has been relaxed. *Cohodes v. Menominee & M. L. & T. Co.* 149 Wis. 308, 313, 135 N. W. 879.

We are urged that the rule in the case of *Olson v. Court of Honor,* 100 Minn. 117, 110 N. W. 374, to the effect that the privilege of such a statute may be waived by the representatives of the deceased patient as well as by the patient himself, should be now adopted instead of the one so long held by this court, viz. that such a provision can be waived by the patient only and not by anybody after his death. *Will of Hunt,* 122 Wis. 460, 466, 100 N. W. 874; *Green v. Nebagamain,* 113 Wis. 508, 89 N. W. 520. But a rule so long established is more properly a subject of legislative and not judicial modification.

That such evidence so improperly received was vitally material and important in this case is very manifest. It necessarily must have had important weight and bearing with the jury in determining the question herein, not only as to the nature and extent of Max Brickman's mental incompetency and whether or not, if such existed, it should have been detected by defendants, but also the question as to whether Brickman relied upon any representations that might be found to have been made, and so therefore it must be held to have been a prejudicial error as against both defendants as to either of the two theories upon which a cause of action may be predicated.

The great weight that was given to this testimony can also be seen from the statement made by the trial court in his rulings on the motions after verdict, to the effect that, even if the testimony of members of the family as to the condition of Max Brickman were disregarded, it was to the court beyond dispute from the testimony of Dr. Lorenz that Brickman was the victim of such brain disease, the result of the trouble with which he had been afflicted for several years, and was therefore not of sufficient mental capacity to make the trade.

The plaintiff offered in evidence, and it was received by consent of counsel for defendants, the proceedings at the commitment of Brickman to the hospital in the county court on November 17th, following the exchange of October 11, 1910. Although this was in the nature of testimony as to the condition existing at a period subsequent to the one material to the issues, yet it was before the jury, and it appeared that the information which the physicians in that examination received was obtained by them from Mrs. Brickman, and it appears therefrom that the symptoms of the disease were first manifest within two or three weeks prior to November 17th, bringing it subsequent to the time of the transfer; that such was the first attack; that the cause of the attack was from his thinking he was defrauded in the sale of the store; that his physical condition was good; that he had not manifested anything peculiar in temper, habits, or disposition or pursuits before the accession of the disease; and so far as the physicians can learn had never had any sign of serious disease. It should be noticed also from the records that it appears that no suggestion of the condition of brain disease or serious affliction was made by any of the other witnesses until Dr. Lorenz's testimony had been admitted.

Furthermore, the recital of such facts so testified to by Dr. Lorenz was embodied in both of the hypothetical questions put to him and to Dr. Green as to whether or not, in their

judgment, such person was incompetent and so incompetent that third persons should have recognized that fact.

In view of the sharp conflict of evidence on the essential questions in the case, we are constrained to hold that the admission of the testimony of Dr. Lorenz as to the result of his examination of Max Brickman was such an error that it worked a substantial prejudice to the defendants and that it must result in a reversal of the judgment.

On the third point urged, viz. error in allowing the other hypothetical question put to Dr. Lorenz and Dr. Green, asking in effect whether in their judgment persons of ordinary intelligence and prudence should have known, situated as the defendants were towards Brickman, that Brickman had not sufficient mental ability to know what he was doing and the nature and quality of the act and the consequences thereof, the answer in each instance being that the witness thought defendants should have known, this is no more and no less than asking the witness whether any person should have known, from the acts and conditions of Brickman as recited in the question, that he was incompetent to transact business. This is not such a form of question as calls for expert testimony, for it is permitting the witness to do just what the jury is expected and required to do, and is not properly a question for what is generally called expert testimony.

If a person of ordinary intelligence and prudence could have detected from the condition of Brickman his mental incompetency, then it was not a situation that required expert knowledge to inform the jury; for what the average man can detect for himself is clearly within the province of the jury. As it was held in *Knoll v. State,* 55 Wis. 249, 12 N. W. 369, it was erroneous to admit the testimony of an expert testifying as to a comparison by him made, which he said any person could have made as well as himself. The same doctrine is recognized as correct in *Lomoe v. Superior W., L. & P. Co.* 147 Wis. 5, 11, 132 N. W. 623, and in

*Mellor v. Utica,* 48 Wis. 457, 4 N. W. 655; *McKone v. Metropolitan L. Ins. Co.* 131 Wis. 243, 253, 110 N. W. 472; *Koblenschlag v. State,* 23 Tex. Ct. App. 264, 4 S. W. 888.

It was from the very form of the question not a matter which partakes of the nature of a science so as to require any course of previous habit or study in order to permit one to be better fitted to answer the question than the ordinary individual is. What impression a given state of facts would have upon the ordinary individual can be as well told by the jurors themselves as by any individual in the witness box, and such a question, therefore, was not the subject of expert testimony. *State v. Brooks* (Iowa) 165 N. W. 194; *Dougherty v. Milliken,* 163 N. Y. 527, 57 N. E. 757; *Higgins v. Dewey,* 107 Mass. 494; *Wight F. P. Co. v. Poczekai,* 130 Ill. 139, 22 N. E. 543; 17 Cyc. 45.

The objection, therefore, to this form of question should have been sustained. If the other evidence before the jury had been properly received, we would not have felt inclined to reverse the case on this error alone.

The defendants also raise the question as to the measure of damages as found by the jury in the first question of the special verdict, but we are satisfied that there is evidence to support such finding and it ought not to be disturbed.

*By the Court.*—The judgment of the circuit court is reversed, and a new trial ordered.