McGINTY, Appellant, vs. BROTHERHOOD OF RAILWAY TRAINMEN, Respondent.

*April 30—May 27, 1919.*

*Life insurance: Question for jury: Misrepresentations: Witnesses: Confidential communications: Physician and patient: Waiver.*

1. In an action on a life insurance policy, the question whether insured's father was afflicted with cancer, contrary to the statement of insured in his application, and in fact died of cancer, is for the jury.
2. In such an action the court properly refused to permit a physician to testify that he told insured's mother that her husband had cancer, the mother having testified that the physician made no such statement; for the physician's knowledge in this respect constituted a communication the confidential nature of which could be waived by no one except insured's father himself, and the physician could not thus be permitted to testify indirectly as to matters concerning which he could not testify directly.

APPEAL from a judgment of the circuit court for Juneau county: JAMES WICKHAM, Judge.    *Reversed.*

This action was brought by the plaintiff, mother of John McGinty and beneficiary under a policy of life insurance issued upon his life by the defendant.    John McGinty died February 25, 1913.    His application for life insurance was

McGinty v. Brotherhood of Railway Trainmen, 169 Wis. 366.

made in September, 1911.    In such application he stated that he himself had never been afflicted with syphilis or any disease of the genital or urinary organs, and that his father had never had any cancerous disease.    The *Brotherhood* defended on the ground that these representations were false, and that John McGinty, the insured, had been afflicted with syphilis prior to his application for the insurance, and that his father, prior to such application, died as a result of a cancer.    The issues thus raised were the only questions litigated.

The jury returned the following special verdict: (1) that Michael McGinty, the father of the insured, was not afflicted with cancer; (2) that the applicant, John J. McGinty, at the time the application was made, September 26, 1911, had never been afflicted with syphilis; (3) that the applicant, John J. McGinty, at the time the application was made, had never been afflicted with gonorrhea; (4) that the certificate in question was not procured by the fraud and deceit of John J. McGinty; and (5) damages, $1,880.50.

The defendant thereupon moved to change the answers of the jury to the first four questions of the special verdict from No to Yes, and, in the event of a denial of such motion, for judgment notwithstanding the verdict, on the ground that it was not supported by the evidence.    The court changed the answer of the jury to the first question from No to Yes, denied the motions as to the other questions, and, upon the verdict as so changed, ordered judgment for the defendant, from which plaintiff appealed.

For the appellant there were briefs by *J. T. Dithmar* and *R. P. Clark,* both of Elroy, and oral argument by *Mr. Dithmar.*

For the respondent there was a brief by *Bentley, Kelley & Hill* of Baraboo, and oral argument by *F. R. Bentley.*

OWEN, J.    The principal question to be considered is whether there is any credible evidence to support the answer

of the jury to the first question of the special verdict whereby it was found that Michael McGinty, father of John McGinty, did not die of a cancer.   The evidence in this respect shows that during the month of January, 1910, Michael McGinty was struck on the jaw by a piece of wood, and that from that time on he suffered more or less pain in the head, and especially in the region of the jaw, where he was struck.   During the month of April he went to a dentist and had some teeth extracted, believing that the pain was the result of the condition of his teeth.   The dentist extracted the teeth requested and dismissed him.   He noticed that he had a great many badly decayed teeth and that his mouth was irritated.   He concluded it was a case of pyorrhea.   The extraction of the teeth did not relieve the pain, and in a few days Dr. Vogel was called in.   He made an incision on the jaw in the region of the extracted teeth.   He attended him for three days and was then dismissed and Dr. O'Neill was called in.   On the occasion of his (Dr. O'Neill's) second or third visit he pulled another of his teeth, located in the vicinity of where Dr. Vogel had made the incision, and told *Mrs. McGinty* to wash the sore before he ate in the morning.   A swelling developed on the outside of the cheek and Dr. O'Neill opened that. This was some time in June.   This came to be a running, suppurating sore on his cheek.   About the only treatment administered up until the time of his death, which occurred September 18, 1910, consisted in keeping this sore open and clean.   Dr. O'Neill made out a death certificate in which he certified the cause of death to be "injury of head."

Upon his application for the life insurance John McGinty was examined by Dr. O'Neill, who made a certificate of such examination.   He wrote into the certificate, in his own handwriting, in answer to a question calling for the information, the fact that John McGinty's father had never had cancer. He also wrote into the certificate the fact that John McGinty had never had syphilis.   After John McGinty died, and after the plaintiff had made application for the money upon

the insurance policy, Dr. O'Neill wrote to the defendant company stating that Michael McGinty had died of cancer, and that he had treated John McGinty for syphilis prior to the time of the issuance of the insurance policy to him.

This is the second appearance of this case in this court. It was heard on a prior appeal and will be found reported in 166 Wis. 83, 164 N. W. 249, a reference to which will furnish further details.

We come now directly to the question of whether the record before us contains any credible evidence supporting the finding of the jury to the first question whereby it was determined that Michael McGinty did not die of cancer. Dr. O'Neill was brought forward as a witness for the defendant to prove that Michael McGinty died of cancer. It will be remembered that Dr. O'Neill made out the death certificate in which he certified that the cause of death was "injury of head." Upon the witness stand he testified that in his opinion Michael McGinty died of cancer. When confronted with the fact that he had certified in the death certificate that the cause of death was "injury of head" he said: "Well, in this case I didn't know what the truth was, nor am I positive yet, the cause of death in this case. I supposed it cancer, and by saying it was not I don't see where I lied because I don't know yet whether it was cancer or not." That is the most satisfactory and probably the most truthful statement that Dr. O'Neill made upon the stand, and the most that can be said of his testimony is that he did not know whether Michael McGinty died of cancer.

Four other physicians testified in the case in response to hypothetical questions. Drs. Vogel and Cahoun testified that in their opinion, based upon the hypothetical questions propounded to them, Michael McGinty died of cancer. Dr. Hansberry testified, in response to a hypothetical question propounded to him, that in his opinion the cause of death was blood poisoning. Dr. Evans, a physician from La Crosse, of exceptional experience, testified that from the facts in-

cluded in the hypothetical question propounded to him, which question included all facts disclosed by the testimony in the case, it would be impossible to form an opinion as to the cause of death. So we have the testimony of Dr. O'Neill, the attending physician, to the effect that he does not know what was the cause of death; the testimony of two physicians who are willing to say that the facts proved indicate death by reason of cancer; another physician who says that the facts proved indicate death as a result of blood poisoning; and the testimony of Dr. Evans, a man of broad professional experience, who says that he is unwilling to say what the cause of death was. Upon this state of the evidence it seems clear to us that there was presented a jury question, and that the court was not justified in setting aside the answer of the jury to the first question. In addition to this, the hypothetical questions propounded to the medical witnesses, in nearly every instance, assumed as facts statements concerning which the testimony of Dr. O'Neill constituted the sole evidence in the case. We have no hesitancy in saying that the jury had a right to disbelieve all uncorroborated statements made by Dr. O'Neill, and that in so far as the hypothetical questions included assumptions of fact depending solely upon Dr. O'Neill's testimony the jury had a right to treat such questions as assuming facts not proved in the case.

It is true that while Dr. Hansberry, in response to a hypothetical question propounded to him on direct examination, testified that in his opinion the cause of death was chronic blood poisoning, upon cross-examination he testified as follows:

"*Q.* And if you found a patient in a condition where for no other apparent cause the teeth had become loosened and easily extracted and he was suffering considerable pain and after the extraction of that tooth he wasn't relieved from the pain and that there was a mushroom growth came in soon after the extraction of the teeth, wouldn't you pretty strongly suspect cancer? *A.* With those symptoms, yes."

It should be noticed that this question assumes that a mushroom growth appeared soon after the extraction of the teeth. There is absolutely no evidence in the case of the presence of a mushroom growth except the evidence of Dr. O'Neill, and the jury was not bound to find as a fact that such mushroom growth existed.

In the hypothetical question propounded to Dr. Cahoun it was assumed that the glands in the neck had become enlarged, due to glandular inflammation, and in the hypothetical question propounded to Dr. Vogel it was assumed that "a growth had developed in the inside of the cheek or in the mouth," also that the growth was suppurating, discharging some fluid," also that it "had eaten and worked through the cheek,"—none of these facts were testified to by any other person than Dr. O'Neill. So we have here a state of the record not only where the medical testimony is pretty well balanced as to whether cancer was the cause of death, but the further fact that the opinions of those medical experts who testified that the cause of death was cancer are based upon assumptions of fact not proven by credible evidence. We do not think this record shows conclusively that cancer was the cause of Michael McGinty's death; and the trial court was not justified in changing the verdict of the jury in this respect.

As already stated, the defendant moved to have the answers to questions 2, 3, and 4 changed from No to Yes. The motion was in this respect denied by the court. Defendant has preserved its right to have such action of the court reviewed, and urges that the answers to questions 2, 3, and 4 should have been changed by the trial court because not supported by any credible evidence. We need say no more than that we have carefully examined the record upon the question and are of the opinion that the trial court ruled properly thereon.

Defendant also urges that the trial court erred in refusing to permit Dr. Vogel to testify that he told *Mrs. McGinty,* at

the time of his professional visit, that her husband, Michael McGinty, had cancer. *Mrs. McGinty* had been examined adversely and testified that Dr. Vogel did not make such statement to her. A portion of Dr. Vogel's deposition was then offered in evidence to show that he had made such statement. The court excluded the testimony. We see no theory upon which this testimony could be received. It certainly could not be probative evidence of the fact that Michael McGinty in fact had cancer. Dr. Vogel could not testify to that fact. His knowledge in that respect constituted a confidential communication which the statute prohibits him to reveal. The confidential nature of the communication could not be waived by any one except Michael McGinty himself. *Casson v. Schoenfeld,* 166 Wis. 401, 166 N. W. 23. The privilege of the statute would not amount to very much if the physician were permitted to testify in this indirect manner to facts concerning which he could not give direct testimony. Besides, the jury found that Michael McGinty did not in fact die of cancer. In view of this finding, it is entirely immaterial what Dr. Vogel told her or what her knowledge or belief upon this subject was. The testimony clearly was not admissible, and there is nothing in the opinion on the prior appeal of this case, to which we are referred, indicating that it should have been admitted. In that case it was held that John McGinty had waived the privilege so far as confidential communications between himself and Dr. O'Neill were concerned. This waiver, however, did not extend to confidential communications between his father and his physicians.

*By the Court.*—Judgment reversed, and cause remanded with instructions to enter judgment in favor of the plaintiff upon the special verdict.