In re Margaret Louise CREEKMORE, Debtor.

Bessie SHELBY, by and through the guardian of her estate, Bruce Stephenson, Plaintiff,

v.

Margaret Louise CREEKMORE, Defendant.

Bankruptcy No. 81–01925.
Adv. No. 82–0013.

United States Bankruptcy Court, W. D. Oklahoma.

May 21, 1982.

Bruce Stephenson, Oklahoma City, Okl., for plaintiff.

Ronald Lee Wallace, Oklahoma City, Okl., for debtor/defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT L. BERRY, Bankruptcy Judge.

### Statement of the Case

This adversary proceeding was commenced on January 14, 1982, by the filing of Plaintiff's complaint against the debtor requesting this Court to determine the dischargeability of a state court judgment debt. Plaintiff alleged the debt to be for the obtaining of property by actual fraud and, hence, not dischargeable in bankruptcy under the provisions of 11 U.S.C. § 523(a)(2)(A).

### Facts

The state court action which gave rise to these proceedings involved a dispute between Bruce Stephenson, as guardian of the estate of Bessie Shelby, an incompetent person, and Louise Creekmore, Bessie's daughter. On May 5, 1981, Judge Milbern J. Adams of the District Court of Grady County, Oklahoma, caused a Journal Entry and Order to be filed which contained approximately thirteen pages of factual findings by that Court exhibiting an extremely thorough consideration of the evidence received in that case. These factual findings are summarized as follows:

In August of 1958, Bessie and Elmer Shelby allegedly entered into a common-law marriage. At that time each had children born of previous marriages.

On March 29, 1966, Bessie and Elmer entered into an antenuptial agreement and were married in a civil ceremony. They were then 68 and 72 years of age respectively.

Elmer died June 10, 1968. A legal dispute then ensued between Bessie and Elmer's children over the disposition of Elmer's estate which was valued in excess of $750,000.00. Against the advice of her counsel, Bessie was persuaded by her daughter, Louise Creekmore, to settle the case "to avoid publicly airing the alleged common-law relationship." As a result of the settlement Bessie received a widow's allowance, $30,000.00 in cash and some real property in Chickasha, Oklahoma, consisting of a home and 40 acres.

In the mid 1970's, Bessie's children became concerned over Bessie's ability to manage her property. There were occasions when Bessie would call realtors and place her house on the market and then later tear down the for-sale signs, expressing concern that someone was trying to sell her property.

On March 21, 1977, in order to aid Bessie in the management of her property, a power of attorney was executed giving Bessie's three children the authority to manage the property. Also on that same date, a Warranty Deed was executed and delivered conveying Bessie's house to the children—its purported purpose being to substitute for a will.

In May of 1979, Bessie and her three children along with an accountant met in the offices of some attorneys in Chickasha, Oklahoma. At that meeting the attorneys explained to all present that a promissory note in the amount of $130,000.00 should be executed by the children in favor of Bessie in order to avoid a $30,000.00 gift tax liability for Bessie's deeding them her home in 1977. The attorneys also assured the children that no collections were ever intended to be made on the note, its sole purpose being to avoid the tax liability. The note was executed, back-dated to March 21, 1977, and delivered.

In September of 1979, Bessie and her daughter, Louise, again visited the Chickasha attorneys—this time in an effort to regain the property from Bessie's other two children. Bessie authorized the attorneys to bring suit on the $130,000.00 note, which they did on October 3, 1979. When the children contacted Bessie after receiving notice of the lawsuit, however, she denied any knowledge of it.

In November of 1979, Louise and the other two children executed a Warranty Deed conveying the property back to Bessie. In December of 1979, Bessie dismissed the lawsuit against her children without the knowledge of her attorneys.

On January 22, 1980, Bessie and Louise returned to the offices of the Chickasha attorneys. This meeting had been called at the attorneys' request mainly for the purpose of collecting their unpaid fees. As a result of this meeting, Bessie executed a Warranty Deed conveying the house, 4 surrounding acres and 36 mineral acres to Louise. Louise then conveyed 6 mineral acres to the attorneys purportedly in payment of their fees.

On May 1, 1980, a petition was filed in the Grady County District Court seeking to set aside the conveyances of January 22, 1980. On June 17, 1980, Bruce Stephenson, having been appointed guardian of Bessie's estate, was substituted as party plaintiff.

Throughout Judge Adams' findings of fact are cited numerous instances where Bessie exhibited irrational behavior. His findings also contain some two pages of expert medical testimony relating to Bessie's incompetence.

In setting aside the conveyances of January 22, 1980, and restoring ownership of the property to Bessie in fee simple, Judge Adams made the following statements:

" . . . My impression is that Bessie Shelby acts as a small child would to get attention and love from those around her. She tragically lost her husband, Elmer Shelby, and went through the trauma of litigation to try and obtain property she deserved out of the Shelby estate. Louise Creekmore, out of a selfish modesty and a strained sense of morality, influenced her mother to settle the probate litigation to avoid what Louise Creekmore considered an embarrassing circumstance .. her mother's common-law relationship for several years with Elmer Shelby.

"Bessie Shelby's children feared that someone would eventually cheat her out of her small settlement—the home and the forty (40) acres. That has occurred. *There are elements of fraud and misrepresentation apparent in the 1979 and 1980 transactions* detailed in the Court's Findings of Fact and born out by the record. A review of the entire transcript of this trial reveals a combination of facts and circumstances which leads this Court to but one conclusion, that is: *On January 22nd, 1980, Bessie May Shelby's mental condition was taken advantage of by Louise Creekmore.*

\* \* \* \* \* \*

"Based on all the evidence in this case, the Court FINDS and it is so ORDERED, that *the deeds executed by Bessie Mae Shelby on January 22nd, 1980, are null and void because they are the result of fraud and undue influence* exercised upon her . . . ." (Emphasis added.)

In addition to the setting aside of the real property conveyances, Judge Adams also rendered a Judgment in the amount of $13,-837.05 for attorney fees and costs to the plaintiff. It is that judgment which the plaintiff herein now seeks this Court to declare not dischargeable in bankruptcy.

### Law

Plaintiff asserts that the findings of the Oklahoma District Court of Grady County, Oklahoma, as set forth in its Journal Entry and Order, render the judgment debt nondischargeable in bankruptcy. The first matter for consideration, therefore, is the extent to which this Court is bound by those findings.

In *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), the U.S. Supreme Court refused to apply the doctrine of res judicata in dischargeability proceed-

ings under § 17 of the former Bankruptcy Act, and held that a bankruptcy court is not confined to a review of the judgment and record in prior state-court proceedings when considering the dischargeability of a judgment debt. In so doing, however, the Court added:

"This case concerns res judicata only, and not the narrower principle of collateral estoppel. Whereas res judicata forecloses all that which might have been litigated previously, collateral estoppel treats as final only those questions actually and necessarily decided in a prior suit. . . . [citations omitted] . . . If, in the course of adjudicating a state-law question, a state court should determine factual issues using standards identical to those of § 17, then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in the bankruptcy court." *Brown v. Felsen,* supra, note 10.

In *Matter of Ross,* 602 F.2d 604 (3rd Cir. 1979), the court said:

". . . *Brown v. Felsen,* supra . . . indicates that the doctrine of collateral estoppel may be applicable to a dischargeability determination by the bankruptcy court. In order for the doctrine to bar relitigation of the dischargeability issue, the bankruptcy court would have to find that:

'. . . (1) the issue sought to be precluded must be the same as that involved in the prior action; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.'

*Haize v. Hanover Ins. Co.,* 536 F.2d 576, 579 (3d Cir. 1976). See also *Matter of McMillan,* 579 F.2d 289 (3d Cir. 1978)."

Taking the aforementioned elements in reverse order, there can be no doubt that Judge Adams' determinations concerning fraud and undue influence were essential to his judgments setting aside the conveyances and granting attorney fees. Likewise, there is no question as to the validity and finality of his judgment, or that the issues were fully litigated during four days of trial.

The sole remaining question, therefore, is whether the issues before this Court are the same as those involved in the state-court case. In other words, did Judge Adams use the same standards concerning fraud as this Court must use in determining dischargeability under 11 U.S.C. § 523?

11 U.S.C. § 523 provides in pertinent part:

"(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

\*     \*     \*     \*     \*     \*

"(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

"(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . ."

Bankruptcy Code legislative history indicates that "Subparagraph (a) is intended to codify current case law e.g., *Neal v. Clark,* 95 U.S. 704, 24 L.Ed. 586 (1878), which interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law." 124 Cong.Rec. H 11096 (Sept. 28, 1978).

In *Ames v. Moir,* 138 U.S. 306, 11 S.Ct. 311, 34 L.Ed. 951 (1891), the U.S. Supreme Court, citing *Neal v. Clark, supra,* stated:

". . . It is the settled doctrine of this court that 'fraud' in the Act of Congress defining the debts from which a bankrupt is not relieved by a discharge in bankruptcy means 'positive fraud, or fraud in fact involving moral turpitude or intentional wrong, as does embezzlement, and not implied fraud or fraud in law, which may exist without the imputation of bad faith or immorality.'"

In Oklahoma, the terms "actual fraud", "constructive fraud", and "undue influence" as applied to contracts are defined by statute. 15 Okl.Stat.Ann. § 58 states:

"Actual fraud, within the meaning of this chapter, consists in any of the follow-

ing acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true.

2. The positive assertion in a manner not warranted by the information of the person making it, of that which is not true, though he believe it to be true.

3. The suppression of that which is true, by one having knowledge or belief of the fact.

4. A promise made without any intention of performing it; or,

5. Any other act fitted to deceive."

15 Okl.Stat.Ann. § 59 provides:

"Constructive fraud consists:

1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,

2. In any such act or ommission as the law specially declares to be fraudulent, without respect to actual fraud."

15 Okl.Stat.Ann. § 61 states:

"Undue influence consists:

1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him.

2. In taking an unfair advantage of another's weakness of mind; or,

3. In taking a grossly oppressive and unfair advantage of another's necessities or distress."

In *Stapleton v. Holt*, 207 Okl. 443, 250 P.2d 451 (1952), and several other cases, we find the following additional description of the term "fraud" used in Oklahoma law:

"Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, disembling, and any unfair way by which another is cheated . . . ."

In *Faulkenberry v. Kansas City Southern Ry. Co.*, 602 P.2d 203 (Okl.1979), the Oklahoma Supreme Court differentiated "actual" and "constructive" fraud:

"Fraud, a generic term with multiple meanings, is divided into actual and constructive. Actual fraud is the intentional misrepresentation or concealment of a material fact which substantially affects another person. Constructive fraud a breach of either legal or equitable duty— does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose . . . ."

Thus, it is apparent that both federal bankruptcy law and Oklahoma statutory and case law agree that fraud may be either actual or constructive, and that the basic difference between the two is the intent of the perpetrator. Where the perpetrator acts in bad faith and intentionally commits a wrong, the fraud is "actual". If there is no dishonesty of purpose, however, any fraud deemed by law to be involved is of a "constructive" nature.

Judge Adams' conclusion that "Bessie May Shelby's mental condition was taken advantage of by Louise Creekmore," obviously indicates that his decision was based on the above quoted provisions of 15 Okl.St. Ann. § 61(2). The question then arises as to whether the fact that the Oklahoma legislature chose to define the "undue influence" in a separate statute from those defining actual and constructive fraud indicates an intention not to include actions which would constitute undue influence within the meaning of the terms "actual fraud" or "constructive fraud".

In *First State Bank of Canute v. Thomas*, 201 Okl. 325, 205 P.2d 866 (1949), the Oklahoma Supreme Court stated that such is not the case:

"We consider it immaterial whether the acts alleged to be wrongful be termed fraud, duress, undue influence, threats or coercion, or force. The term "fraud" is difficult to define. It generally contains an element of falsity and deceit, while duress or undue influence overcomes the will and destroys free agency.

"This court has adopted what is sometimes termed the modern view of fraud, and has held in many instances that fraud is a "generic" term and embraces all unfair ways by which another is cheated or unlawfully imposed upon. Under these decisions, the term 'fraud' may include certain elements of duress, undue influence, threats and intimidation. . . . "

Having decided that the term "fraud" includes undue influence, we now face the question as to which type of fraud is involved. Although this Court's research has been unable to locate any Oklahoma cases specifically discussing undue influence in terms of actual or constructive fraud, cases of other jurisdictions have been found which do shed light on the problem. In *Hunt v. Golden*, 271 Or. 321, 532 P.2d 26 (1975), the Supreme Court of Oregon announced the following rule:

"Where one obtains property by a contract made with a person he knows to be incompetent and knowingly takes advantage of such incompetency to his own advantage and to the detriment of the incompetent, such action constitutes fraud and will warrant either rescission or an action for damages upon behalf of the incompetent. The following cases substantiate such a rule: *Baird v. Howard*, 51 Ohio St. 57, 36 N.E. 732, 733–34 (1894); *Casson v. Schoenfeld*, 166 Wis. 401, 166 N.W. 23, 24–25 (1910) (reversed on other grounds). Also see Am.Jur.2d 636, Incompetent Persons § 97.

"Defendant also claims there is no basis for punitive damages because there is no evidence defendant knew of plaintiffs' incompetency. To the contrary, there is ample evidence from which it could be found that he was well aware of plaintiffs' condition."

■ It is significant that in the *Hunt* case punitive damages were awarded based on the defendant's knowledge of the plaintiffs' mental condition. In Oregon, as in most jurisdictions, punitive damages are assessed against a defendant "whose acts are characterized by malice or other circumstances of aggravation." *Van Lom v. Schneiderman*, 187 Or. 89, 210 P.2d 461 (1949). This inexorably leads one to the conclusion that where a person knowingly and intentionally takes advantage of another's mental incompetence to get his property, such conduct is malicious and must therefore be characterized as "actual" as opposed to "constructive" fraud.

■ In the instant case, there is ample evidence to support a finding that Louise Creekmore knowingly and intentionally took advantage of her mother's mental condition to obtain her property. The fact that all of Bessie's children, including Louise Creekmore, were aware of her mental condition is well substantiated. In fact, it was due to their concern that Bessie was incapable of managing her property—a concern which grew from numerous observations of Bessie's irrational behavior—that the property was first conveyed to them in 1977.

It was during that period beginning in late 1979, however, in which Louise Creekmore's actions demonstrated an actual fraudulent intent. She began by assisting her mother to regain the property through legal action, and ended by gaining total ownership of the property herself on January 22, 1980—only 6 days after a deed was filed which finally returned the property to Bessie.

Approximately two months later, Bessie demanded Louise convey the property back to her and Louise refused. Louise explained to Bessie later that same day, "We don't want you getting rid of the land."

As stated before, this Court is convinced there is ample evidence to support Judge Adams' findings of fraud and undue influence. Moreover, if this Court were to render an independent conclusion based on the facts of this case, it would be that actual

fraud was committed by Louise Creekmore to obtain Bessie Shelby's property.

### Conclusion

In light of the foregoing factual findings and legal authorities, it is this Court's considered opinion that it is bound by the findings of the Oklahoma District Court of Grady County, Oklahoma, under the principals of collateral estoppel and that these findings warrant a conclusion by this Court that the attorney fees awarded in connection with that case in the amount of $13,837.05 are not dischargeable in bankruptcy.

IT IS SO ORDERED.