MASSACHUSETTS MUTUAL LIFE INSURANCE CO. *v.*
BOARD OF TRUSTEES OF MICHIGAN ASYLUM
FOR THE INSANE.

EVIDENCE—WITNESSES—RECORDS — PRIVILEGED COMMUNICATIONS —
CONFIDENTIAL RELATIONS—PHYSICIAN AND PATIENT.

An insurance company, which claims that a policy holder committed fraud in procuring insurance and that he was suffering from paresis at the time he applied for his policy, is not entitled to inspect the records showing his mental and physical condition made by a physician of a public asylum in which decedent was confined when he died; the evidence was privileged under 3 Comp. Laws, § 10181, as amended by Act No. 234, Pub. Acts 1909 (5 How. Stat. [2d Ed.] § 12826), upon a showing that the records contained information necessary for the proper care and treatment of inmates.[1]

---

[1] As to whether hospital records are within the privilege extended to communications between physician and patient, see note in 14 L. R. A. (N. S.) 565.

Mandamus by the Massachusetts Mutual Life Insurance Company and Charles W. Pickell against the board of trustees of the Michigan asylum for the insane at Kalamazoo. Allie B. Willey and others filed an intervening petition. Submitted November 18, 1913. (Calendar No. 25,930.) Writ denied December 20, 1913.

*H. E. Spalding* and *James H. McDonald,* for relators.

*Grant Fellows,* Attorney General, *Thomas A. Lawler* and *L. W. Carr,* Assistant Attorneys General, for respondent.

*Charles H. Chase (Edwin H. Lyon,* of counsel), for interveners.

MOORE, J. This is a petition for a writ of mandamus to compel the board of trustees of the Michigan asylum for the insane, at Kalamazoo, to permit the relators to inspect the records of the asylum containing information concerning the mental and physical condition of one Vernon J. Willey, who was a patient in the asylum from July, 1910, until his death in December, 1912.

On August 6, 1910, relators began a suit in the circuit court for the county of Wayne, in chancery, against Vernon J. Willey and others for the cancellation of certain policies of life insurance which had been issued by the insurance company, one of the relators, to Willey in April, 1910, and in which the other defendants and Willey's estate were named as beneficiaries. After the commencement of the suit, Willey died, and the suit is now pending against his administratrix and the other defendants.

It is the claim of the complainants in said suit that the issuance of the policies was induced by certain false and fraudulent representations by Willey in his application for insurance that he was in good physical

condition, when he was in fact suffering from general paresis. In July, 1910, a few months after the issuance of the policies, Willey was admitted to the Michigan asylum for the insane, at Kalamazoo, and remained there until his death in December, 1912.

It is claimed that the information sought is necessary to prepare for the trial of the above-mentioned lawsuit.

In the return of the respondents is the following:

"Respondent admits that relators made application to the board of trustees on the 18th day of July, 1913 for permission to inspect the records of said asylum showing the condition of said Vernon J. Willey for the purposes set forth, and admit that on the 5th day of August, 1913, the respondent board denied such request; that the following is the action taken by said respondent:

" 'The communication of Messrs. Walker and Spaulding, of Detroit, under date of August 18, 1913, asking that they be permitted to inspect the records of this institution in order that they, as attorneys for the Massachusetts Mutual Life Insurance Company, may secure information to be used in a suit now pending against the heirs of Vernon J. Willey to set aside certain life insurance contracts, and the board being advised that the information contained in such records was obtained by physicians in their professional character, and was necessary to enable them to prescribe for said Vernon J. Willey, and that said physicians have once declined to permit an examination of such records or disclose any information so obtained.

" 'Resolved, that we hereby approve of the action of the medical staff in refusing an inspection of such records, and declining to disclose any information secured in the manner aforesaid, and the aforesaid request is therefore declined, and the secretary instructed to forward a copy of this resolution to the attorneys for said insurance company.'

"VI. Answering paragraph 6, respondent states and shows unto the court that the said records contain information essential and necessary for the proper care and treatment of the insane patients confined in said asylum, and such records are for the purpose of determining the proper treatment to be given

such patients as are inmates of said asylum, and that the records of said asylum with reference to the said Vernon J. Willey were made for the purposes herein enumerated. Said board respectfully denies that such records are public documents, and denies that the relators are entitled to inspect them, and respectfully submit that it is not the duty of the respondent to permit relators to inspect said records for the purposes set forth in said petition, or for any other purpose."

Counsel for relators contend for two propositions:

"(1) The records of the asylum are open to the inspection of the relators under the terms of Act No. 76 of 1903.

"(2) The relators, as parties to the suit pending in the Wayne circuit court, have the right at common law to inspect the records of the asylum for the purpose of obtaining information necessary to enable them to prepare for the trial of such suit."

We quote from the brief of counsel:

"The records of the State asylum at Kalamazoo are made and kept by officers and employees of the State in the discharge of official duties. As public records they are open to the inspection of the public under the terms of Act No. 76 of 1903."

Act No. 76 provides as follows:

"The officers having the custody of any county, city, township, town, village, school district or other public records in this State shall furnish proper and reasonable facilities for the inspection and examination of the records and files in their respective offices, and for making memoranda or transcripts therefrom, during the usual business hours, to all persons having occasion to make examination of them for any lawful purpose: *Provided,* that the custodian of said records and files may make such reasonable rules and regulations with reference to the inspection and examination of them as shall be necessary for the protection of said records and files and to prevent the interference with the regular discharge of the duties of such officer; *and provided further,* that such officer shall

prohibit the use of pen and ink in making copies or notes of records and files."

"Under this act, it was held, in *Kalamazoo Gazette Co.* v. *Kalamazoo County Clerk*, 148 Mich. 460 [111 N. W. 1070], that records of marriage licenses and returns showing marriages in the office of the county clerk are public records, and open to the inspection of those who have occasion to inspect them. A writ of mandamus was, therefore, held properly granted by the circuit court requiring the respondent to permit relator's reporters to examine such records."

Many other cases are cited to this proposition.

The attorney general calls attention to the title of Act No. 76, and suggests that the words "or other public records in the State" must be limited to the public records of those municipalities mentioned in the title, and that the statute does not apply to the records mentioned in relator's petition. The title of the act, so far as it is important, is as follows:

"An act to facilitate the inspection of the records and files in the offices of the county, city, township, town, village, and school districts in this State, amending section 1 of an act to facilitate the inspection of the records and files in the offices of county, city and township officers in this State." (1 How. Stat. [2d Ed.] § 1449).

In reply to this contention, counsel for relators say (we again quote from the brief):

"In the view I take of the case it is unnecessary to consider the objection raised with reference to the title of the statute. The reply to the second and important proposition is this: The general and well-settled rule is that all public records are open to the inspection of all persons, who show an interest therein, and irrespective of whether the records are such as could be introduced in evidence, and also of whether the matter recorded concerns a single person, a number, or the public at large."

This proposition is urged with much earnestness, and many authorities are cited in favor of it. Some

of them are cases directly within the terms of the statute in relation to inspection. Others relate to the common-law right of inspection of public records. None of them are directly in point, though, if no question of privilege was involved in the case, it might be said they were persuasive.

Of the cases cited but three of them relate to the use of records for the purpose of showing physical or mental condition.

In the case of *Hempton* v. *State*, 111 Wis. 127 (86 N. W. 596), Mr. Hempton was on trial for murder. His defense was that he was insane. He sought to have the records of the insane hospital introduced to establish that fact. He was not asserting a privilege; on the contrary, he was waiving it. Clearly not the instant case.

Another case cited is the *Inhabitants of Townsend* v. *Inhabitants of Pepperell*, 99 Mass. 40. The patient was not a party to the litigation. It was a contest between the two towns as to where the woman patient was settled while she was insane. No question of privilege was presented.

The third case, and one upon which much stress is laid, is *Krapp* v. *Insurance Co.*, 143 Mich. 369 (106 N. W. 1107, 114 Am. St. Rep. 651). In that case the proofs of death were permitted in evidence because there was a provision in the policy as follows:

"The proofs of death shall be evidence of the facts therein stated in behalf of, but not against, the company."

The certificate of death was allowed in evidence because it was made under a general law of the State, which in express terms provided:

"All certificates of death, local registers, or county records authorized under this act, or certified copies thereof, shall be *prima facie* evidence in all courts and for all purposes of the facts recorded therein." See section 4617, 2 Comp. Laws.

Clearly that is not the instant case. We shall refer to this case later.

The statute (section 10181, 3 Comp. Laws, as amended by Act No. 234, Public Acts of 1909; 5 How. Stat. [2d Ed.] § 12826), so far as its provisions are material here, reads:

"No person duly authorized to practice physic or surgery shall be allowed to disclose any information which he may have acquired in attending any patient, in his professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon."

This language has frequently been construed by this court. Many of the cases may be found in the note to the compiler's section. The construction has been invariably to preserve the privilege granted by the language of the statute. Similar statutes have also been before this court. See *Shinglemeyer* v. *Wright,* 124 Mich. 230 (82 N. W. 887, 50 L. R. A. 129) ; *People* v. *Pratt,* 133 Mich. 125 (94 N. W. 752, 67 L. R. A. 923) ; *Dick* v. *International Congress,* 138 Mich. 372 (101 N. W. 564).

In *Thomas* v. *Byron Township,* 168 Mich. 593 (134 N. W. 1021, 38 L. R. A. [N. S.] 1186, Ann. Cas. 1913C, 686), a physician was allowed to testify to the conditions he found as the result of an autopsy. In the opinion Justice MCALVAY, speaking for the court, said:

"In a case where a physician has been allowed to testify as to the communications privileged by the statute, Mr. Justice COOLEY, speaking for the court, said:

" 'This evidence ought not to be passed over without remark. It is surprising evidence for many reasons. One of these is that the physician had no business to give it. (The statute is cited and quoted.) Every reputable physician must know of the existence of this statute, and he must know from its very

terms, as well as from the obvious reasons underlying it, that it is not at his option to disclose professional secrets. A rule is prescribed which he is not to be "allowed" to violate; a privilege is guarded which does not belong to him, but to his patient, and which continues indefinitely, and can be waived by no one but the patient himself.' *Storrs* v. *Scougale,* 48 Mich. 387 (12 N. W. 502), and cases cited.

" * * * From the examination of this witness we conclude, by the questions asked, the answers to which were excluded as privileged, that he had during the lifetime of the patient made such an examination of her person, and received such information, as was necessary to diagnose her case and prescribe for her, and also that he had disclosed to defendant's attorney such facts. We must conclude from the record that on account of this relation, which existed between the witness and deceased, it was possible for him to proceed within a few hours after her death to hold an autopsy."

It will be noticed that the statute goes farther than to forbid giving testimony. Its language is:

"No person duly authorized to practice physic or surgery shall be allowed to disclose any information," etc.

In *Davis* v. *Knights of Honor,* 165 N. Y. 159 (58 N. E. 891), in discussing the question of privilege, it was said:

"The defendant's counsel then produced the records of the board of health of Brooklyn, which were identified by the clerk of the department, and offered to prove by the original certificate filed therein by the attending physician the cause of death of the deceased member's two aunts above referred to by the certificate of the respective attending physicians on the occasion of their last illness. The court inquired if the evidence was offered to prove the cause of death, and the defendant's counsel replied that it was. The court thereupon excluded the record, and the defendant's counsel excepted. Thus it will be seen that the question involved in this exception was the right of the defendant's counsel to prove by the certificate of the

physician in attendance during the last illness of the deceased's aunts the cause of death or the particular disease from which they died. It was admitted that the physician had no knowledge on that subject except such as he acquired in his professional capacity and when the relation of physician and patient existed. That testimony of this character is expressly prohibited by section 834 of the Code cannot be denied. That the proof offered and excluded was inadmissible, I may assume to be a proposition too clear for argument, unless the prohibition contained in the section of the Code referred to has been repealed. This court has held that the statements of the attending physician, for the purpose of establishing the cause of death either of the insured himself or of his ancestors or their descendants, although not parties to nor beneficiaries under the contract, were not admissible. They are excluded, not only for the purpose of protecting parties from the disclosure of information imparted in the confidence that must necessarily exist between physician and patient, but on grounds of public policy as well. The disclosure by a physician, whether voluntary or involuntary, of the secrets acquired by him while attending upon a patient in his professional capacity naturally shocks our sense of decency and propriety, and this is one reason why the law forbids it. The form in which the statements are sought to be introduced is of no consequence, whether as a witness on the stand or through the medium of an affidavit or certificate. All are equally under the ban of the statute. *Grattan* v. *Insurance Co.,* 80 N. Y. 281 [36 Am. Rep. 617]; *Renihan* v. *Dennin,* 103 N. Y. 573 [9 N. E. 320, 57 Am. Rep. 770]; *Redmond* v. *Benefit Ass'n,* 150 N. Y. 167-172 [44 N. E. 769]; *Westover* v. *Insurance Co.,* 99 N. Y. 56 [1 N. E. 104, 52 Am. Rep. 1]; *Nelson* v. *Village of Oneida,* 156 N. Y. 219 [50 N. E. 802, 66 Am. St. Rep. 556]; *Buffalo Loan, etc., Co.* v. *Mutual Aid Ass'n,* 126 N. Y. 450 [27 N. E. 942, 22 Am. St. Rep. 839]. * * *

"But the contention of the learned counsel for the defendant is, as of course it must be, that the prohibition contained in section 834 of the Code, as construed by these adjudications, has been repealed, not by any amendment to the Code, or by any general law,

but by an obscure provision of the charter of the city
of New York.  *   *   *

"It is by the use of this latter vague expression,
found among numerous provisions in a local and spe-
cial law, enacted solely for the government of a city,
that a general rule of evidence, which is part of the
Code of Civil Procedure, and which has been in force
in some form for more than half a century, has been
repealed, if at all.  This is really what the contention
of the learned counsel for the defendant amounts to,
and, unless it can be successfully maintained, it is
clear that the evidence offered was properly excluded.
It should be noted, also, that it was not offered to
prove the fact of death, since there was no issue on
that question, but solely to prove the cause of death,
and that, too, not in any local matter over which the
health department had jurisdiction, but in a contro-
versy concerning the enforcement of a contract obli-
gation between private parties in a court of general
jurisdiction.  This local statute, when reasonably and
properly construed and understood, and limited to the
purpose for which it was enacted, does not, in my
opinion, abolish any part of the Code, or affect any
general rule of evidence applicable throughout the
State at the time of its enactment."

Counsel for relator says that in the *Krapp Case,*
*supra,* this court considered the above case, and ex-
pressly declined to follow it.  If reference is made to
the opinion in the *Krapp Case,* it will appear that the
*Davis Case* was distinguished from the one then un-
der consideration, for the reason that the record
offered in evidence was not made under a general law
of the State, but under the provisions of a city char-
ter.  It could well be said that it was not in point in
the *Krapp Case,* for the reasons stated in the opinion;
while it is quite as certain that it is in point in the
case we are now considering, for the reason that the
records which it is sought to reach here are not kept
under any general law of the State, nor does any
statute make them *"prima facie* evidence in all courts
and for all purposes of the facts recorded therein."

In *Sovereign Camp* v. *Grandon*, 64 Neb. 39 (89 N. W. 448), where it was sought to use a record made under the provisions of an ordinance, the court said:

"There is another reason, which, in our opinion, makes it incompetent. If signed by a physician, it contains matter relating to his patient which the physician is not allowed to disclose as a witness upon the trial against the objection of his patient or those representing him. That a record of this character, reciting privileged communications, may be used in evidence against a party where the testimony of the physician making it could not be received, is a proposition so inconsistent with reason and natural rules of justice that we cannot give our consent thereto. The court properly refused to allow the certificate in evidence."

See, also, *Buffalo Loan, etc., Co.* v. *Mutual Aid Ass'n*, 126 N. Y. 450, 458 (27 N. E. 942, 22 Am. St. Rep. 839).

In this connection the language used in *Smart* v. *Kansas City*, 208 Mo. 162 (105 S. W. 709, 14 L. R. A. [N. S.] 565, 123 Am. St. Rep. 415, 13 Am. & Eng. Ann. Cas. 932), is germane. The records of a city hospital kept in accordance with the ordinances of the city were sought to be introduced in evidence in the trial court, upon the ground that they were public records, but were excluded. In affirming the case, the court said:

"The defendant's next contention is that the court erred in excluding the evidence of Dr. Frederick. He was one of the attending physicians at the city hospital, and was the keeper of and had charge of the records of the institution, which were required to be kept by the ordinances of the city. The defendant offered to prove by him the diagnosis of plaintiff's case, as shown by said official record, when she was in the hospital in the years 1895, 1896 and 1898, the latter when her leg was amputated. The plaintiff objected to the evidence offered, because the entries made were privileged communications, first made to

the attending physicians in order that they might correctly diagnose her case and to properly treat her. The diagnosis of the case was made by an examination of the patient and by interrogating her regarding the complaint. This is necessary to be known by the physician in order that he may prescribe the proper treatment, and when he once acquires that information the law declares it to be confidential communications, and disqualifies the physician from divulging the same upon the witness stand.   *   *   *

"This is undoubtedly the rule as announced by all the authorities, and that being so, it seems that it must follow as a natural sequence that when the physician subsequently copies that privileged communication upon the record of the hospital, it still remains privileged. If that is not true, then the law which prevents the hospital physician from testifying to such matters could be violated both in letter and spirit and the statute nullified by the physician copying into the record all the information acquired by him from his patient, and then offer or permit the record to be offered in evidence containing the diagnosis, and thereby accomplish, by indirection, that which is expressly prohibited in a direct manner."

In *Price* v. *Insurance Co.*, 90 Minn. 264 (95 N. W. 118), it was said:

"At the trial an objection was made and overruled to the introduction in evidence by the defendant of the register of patients kept at the Northwestern hospital, with the entries therein relating to the insured. These entries were made by the superintendent in charge, who was a female physician, in the usual course of business at the hospital, and showed when the patient entered, when he departed therefrom, and the nature of the disease from which he was said to be suffering. This superintendent produced the register, and testified that the entries concerning the insured were made after Dr. Kimball, the physician in charge, had observed the case long enough and knew sufficiently about the patient to state the kind of disease, and were based wholly upon information received by her from the doctor. The witness had no personal knowledge of the patient,

and had no recollection of the case, apart from the record. Therefore the entries amounted to nothing more or less than what the superintendent wrote in the register what the attending physician told or reported to her concerning Price's illness.

"To permit these entries to be introduced in evidence was to disregard in a very noticeable manner the rule forbidding the introduction of hearsay testimony, as well as the spirit of the statute which prohibits the examination of a physician as to certain matters without the consent of his patient (G. S. 1894, § 5662), although this last objection does not appear to have been made at the trial. The information communicated by Dr. Kimball to the superintendent of the hospital was acquired by the former while attending the patient, and was necessary to enable him to prescribe or act for him. Dr. Kimball would not have been allowed to make any such disclosure, and the statutory restriction upon him could not be evaded by introducing in evidence testimony of a third party as to what the doctor said about the case. But the entries did not even rise to the dignity of a repetition of what the doctor said to a third party, for the superintendent remembered nothing, except that she made the entries. This testimony should have been excluded."

We are constrained to hold the action of the trustees is justified.

The writ is denied, but without costs.

STEERE, C. J., and MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.