No. 30,689.

CLEMMA A. BELL, *Appellee*, v. LENA BELL NEWKIRK, *Appellant*.

(12 P. 2d 733.)

Opinion filed July 9, 1932.

*J. H. Brady* and *N. E. Snyder*, both of Kansas City, for the appellant.
*C. A. Bowman* and *James M. Meek*, both of Kansas City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action to reform a certificate of fraternal insurance and to recover the amount specified therein.

It appears that on July 20, 1919, a fraternal insurance society named the Court of Honor issued a certificate of insurance for $1,000 to one Finis Bell, of Kansas City, in which his wife, Clemma Bell, was named as beneficiary.

Bell and wife were working-class folk; he was a railway and packing-house employee; she was a waitress and kept a rooming house. Until the last couple of months of Bell's life his wife paid the monthly assessments on the insurance certificate with her own earnings. In the summer of 1930 Bell became afflicted with shortness of breath, general weakness, mitral regurgitation and dropsy. He left his home in Kansas City and went to Warrensburg, Mo., to receive medical attention from a Doctor Anderson, with whom he had been acquainted for many years. While in Warrensburg Bell stayed at the home of a half sister, Lena Bell Newkirk. Within a short time Bell felt sufficiently improved to return to Kansas City, but that improvement was only temporary, and on August 17, 1930, he returned to the home of his half sister for further treatment by Doctor Anderson. On August 19 Doctor Anderson perceived that Bell's condition was so serious that he might require emergency medical attention at any time, and as he (Anderson) had no automobile to enable him to respond promptly on call, he called to his assistance a Doctor Scofield. Doctor Anderson testified:

"The case became so that I had Doctor Scofield take him over on account of my inability to go hurriedly so often. . . . It looked like he was going to die surely, and I wanted some other doctor to see him."

Owing to Mrs. Bell's employment in Kansas City she could not conveniently visit him except on Sundays. On Sunday, August 24, she came to see him. At that time his feet and limbs were badly swollen; he was gasping for breath, and he did not seem very bright. He recognized his wife, but not her sister nor her sister's husband. Three days later, on August 27, Bell's signature was placed on a paper prepared by a local lawyer requesting that the name of his half sister, Lena Bell Newkirk, be substituted for his wife's name as beneficiary of his insurance certificate. Three days later, on August 30, he signed a similar paper on the blank furnished by the insurance company. Next day, Sunday, August 31, Mrs. Bell again visited her husband. By that time Bell's disease had progressed so far that he did not recognize anyone; he had the hallucination that his parents, both long dead, were about; he seemed to be in a stupor; he inquired of a brother-in-law if he had turned his automobile

upside down and had taken its bolts out; he acted as if he could not get his breath.

On September 5 Bell died. Plaintiff brought this action to reinstate her name in the insurance certificate as beneficiary and to recover thereon. The insurance company which had taken over the business of the society which issued it paid the money into court, leaving the widow and the half sister whose name had been substituted as beneficiary to litigate their rival claims. On joinder of issues the nonprofessional testimony in plaintiff's behalf was substantially as outlined above. The nonprofessional testimony adduced in behalf of the defendant sister-in-law was to the effect that Bell was sufficiently alert in mentality as late as August 31 to be able to talk intelligently about having changed his insurance; that he could and did carry on rational conversations; and that he was mentally capable of transacting ordinary business on the day following his purported execution of the instrument requesting that the change of beneficiary be made in his insurance certificate. One witness testified that on Sunday afternoon, August 31, while he and other persons were in the room where Bell was, Mrs. Bell, who had not been accorded any privacy with her husband, put her arms around him and whispered to him, and that Bell responded by telling her to let him alone. At that point, however, the trial court took a hand in the examination:

"By THE COURT: Q. Did it ever occur to you that if a man's wife had traveled sixty miles to see him you should withdraw from the room and let her talk to him in private? A. No, it didn't."

Part of the professional testimony based upon hypothetical questions was to the effect that a man so afflicted and distressed as Bell was shown to be at and prior to the time he signed the paper requesting the change of beneficiary and immediately following its purported execution would be of such lowered mentality as to be incapable of understanding or transacting ordinary business. One professional witness assumed as true the medical diagnosis of August 22 given by the doctors who waited on Bell and had testified in defendant's behalf, and gave a learned dissertation on what must have been the condition of Bell's brain based on such diagnosis. His professional opinion was that Bell's mental condition must have grown progressively worse from that time, August 22, until his death on September 5. There was also professional testimony, as is usual in such cases, to the effect that August 30, the day the

document was signed to cause the beneficiary to be changed, Bell was of sound mind and able to transact business. However, another of defendant's professional witnesses, the one who treated him from August 22 until his death, on cross-examination, admitted:

"Within five or six days after I started to treat him I could notice a change for the worse. The lack of normal flow of blood could cause hallucinations, and could impair the reasoning faculties. There is no standard by which medical men can determine the dividing line when the loss of blood going into the brain will affect the mind."

The trial court called to its aid an advisory jury which answered four special questions:

"Q. 1. On August 30, 1930, at the time Finis Bell made application for change of beneficiary, did the said Finis Bell have sufficient mental capacity to transact business, and make contracts? A. 1. No.

"Q. 2. Did said Finis Bell, on said date, have sufficient mental capacity to understand the nature of his acts and consequences thereof when he requested change of beneficiary? A. 2. No.

"Q. 3. On or after August 22, 1930, was the condition of Finis Bell's heart such as to supply the normal supply of blood in circulation? A. 3. No.

"Q. 4. If you answered the foregoing question 'No,' then state if you find that the absence of a normal supply of blood affected the mind of Finis Bell. A. 4. Yes."

The trial court approved these findings, reformed the insurance certificate, and gave plaintiff judgment as prayed for.

Defendant appeals, urging certain errors, the first of which relates to the overruling of her demurrer to plaintiff's evidence. The main features of that evidence have been summarized above, and it seems useless to debate its sufficiency to withstand a demurrer. The court holds that the error assigned on this point is untenable.

The next error assigned relates to the overruling of defendant's motion for a new trial. Under this assignment it is contended that the opinion evidence of the experts called to testify in plaintiff's behalf was incompetent and inadmissible; that those experts gave testimony as to the ultimate fact which the jury itself was impaneled to determine. We must hold otherwise. The questions the plaintiff's expert witnesses answered were on hypothetical facts based upon a comprehensive summary of the evidence in conformity with good practice. (*Shouse v. Consolidated Flour Mills Co.*, 132 Kan. 108, 113, 294 Pac. 657.) Indeed, the only possible breach of good practice disclosed by the record was committed on behalf of defendant. Her expert witnesses did testify, somewhat dogmatically,

too, to the ultimate fact which it was the function of court and jury to determine—whether Finis Bell was competent to transact business on August 30, when he signed the document requesting that the name of his half sister be substituted for that of his wife as beneficiary of his insurance.

Defendant criticizes the fact that plaintiff did not call Doctors Anderson and Scofield as her witnesses. It was her privilege to refrain from doing so. Since they were called by defendant, the point is of no importance; but their testimony seems to vindicate plaintiff's tactical strategy of letting them be called by defendant.

It is also urged that the court erred in admitting in evidence the contents of a letter which defendant wrote on August 29 in which defendant told plaintiff that Bell's pulse was going down and that the doctor said he was sinking. This court holds that the contents of this letter were competent and probative, and that no court determined to ascertain the controlling facts would permit itself to be deprived of the evidential significance of that letter.

Error is also assigned on the trial court's refusal to give judgment for defendant on the pleadings and evidence notwithstanding the jury's special findings. Where a jury is called in advisory capacity, the primary responsibility for the findings of fact rests with the court (*Maddy v. Hock,* 134 Kan. 15, 4 P. 2d 408), but here the evidence which the trial court chose to believe fully justified the jury's special findings and quite justified the court in adopting those findings as its own. The judgment is affirmed.