No. 31,713

Fred Linscott, as Guardian, etc., of Martha Linscott, a Person of Unsound Mind, *Appellee*, v. James G. Hughbanks, *Appellant*.

(37 P. 2d 26)

354

Opinion filed November 3, 1934.

*Chester Stevens* and *Kirke C. Veeder,* both of Independence, for the appellant.

*Harold Medill,* of Independence, and *Payne H. Ratner,* of Parsons, for the appellee.

The opinion of the court was delivered by

SMITH, J.: This is an action to recover damages for negligence of defendant in operating upon the ward of plaintiff. Judgment was for plaintiff. Defendant appeals.

The ward, who was also the wife of plaintiff, consulted defendant three or four times during 1930. On January 22, 1932, defendant operated on Mrs. Linscott. The operation performed was a supervaginal hysterectomy. This operation consisted of the removal of the upper two-thirds of the uterus. After the operation Mrs. Linscott was put to bed and immediately urine over which she had

no control began to be discharged from the vagina. She remained in the hospital for thirty days. After she was taken home she remained in bed for about two weeks. She was operated on a second time by defendant on April 23, 1932. There is substantial evidence that during all this time urine continued to escape in an unnatural manner through the vagina. This operation did not bring about any relief for this condition. Still another operation was performed on Mrs. Linscott on May 2, 1932, but no relief was had. The effect of the continual discharge of urine caused scalding and soreness of the legs and body around the sex organs. The condition made it necessary for her to wear absorbent pads constantly and kept her in bed most of the time.

This action was filed by her on December 3, 1932. On December 17, 1932, Mrs. Linscott was declared to be insane and committed to the state hospital at Osawatomie. Mr. Linscott was appointed her guardian, and filed a new petition in that capacity. This petition charged defendant with negligence, as follows:

"That said defendant was negligent in performing said hysterectomy operation on said Martha Linscott in that in the performance of said operation defendant negligently and carelessly caused a laceration or injury to the left ureter, resulting in causing an opening in said ureter above the bladder, which now permits the urine coming down the ureter to pass through the injured opening and into the cervix stump where the injured portion of the ureter is now fastened, thence through the vaginal passage and out, which condition renders said Martha Linscott without any control whatsoever over the urine passing through said opening and which condition causes constant irritation and extreme excoriation around the vaginal outlet and perineum."

The petition charged further:

"That after Martha Linscott submitted to the first operation, she thereafter submitted to two additional operations by said defendant at said Mercy Hospital, one on the 23d day of April, 1932, and the other on the 2d day of May, 1932, in which operations defendant attempted to correct said Martha Linscott's condition and lack of control over her urine coming down through the left kidney and ureter; that in attempting to correct said injured condition, said defendant negligently, carelessly, and unskillfully caused a laceration of a portion of the intestine, the exact location of said laceration plaintiff is unable to set out, but which laceration to said intestine caused an opening through which gas and fecal matter is permitted to pass uncontrolled and on into the vaginal passage and out with the urine, thus adding to the irritation and excoriation around the vaginal outlet and perineum."

The answer of defendant was a general denial.

At the trial the position of a woman's anatomy was disclosed. It appears that a woman's urine is carried from the kidney, where it

is generated, down to the bladder through two tubes or canals which are called the ureters. The urine which is generated in the right kidney comes through the right ureter to the bladder and the urine which is generated in the left kidney goes to the bladder through the left ureter. The urine is held in the bladder until it is to be released and then passes through another tube, called the urethra, which extends from the bladder to the outlet above the vagina. It is an entirely separate and distinct opening from the vagina, which is used for sexual relations and the birth of the child. Near the external opening of the urethra is a muscle known as the sphincter, which closes the urethral canal and holds the urine back until it is to be released.

The first error of which defendant complains is of the admission of testimony of the plaintiff that during the operation defendant threw a knife across the operating room. The objection to this bit of evidence was that it was wholly immaterial and tended to prove or disprove no issue in the case. The court remarked that it would be received for what it was worth. Defendant insists that it had no worth and that it was prejudicial. The incident was said to have occurred shortly after the anæsthetic was given. It was clearly part of the res gestæ. The charge in the petition is that defendant performed the operation negligently. The throwing of a knife during the course of the operation has some bearing on that question.

The next error of which defendant complains is of the admissions of some testimony of the husband as to actions of his wife after the third operation. The following question was asked:

"Q. Now along about the time, or during the summer of 1932, can you tell us any of the things that your wife did there that would indicate that she might not have full reasoning power?"

An objection of defendant to this question was sustained, whereupon counsel asked about Mrs. Linscott's actions after her return from the hospital following the third operation. To this plaintiff stated that she cried, worried about her urine burning her, set fire to herself, poured coal oil on herself, put her good clothes and colored clothes in the washing at the same time, and put soap and soda in the beans on the stove. This does not constitute testimony by a layman as to whether or not a person is sane. It is only the statement of facts. Even though the question had called for an opinion as to the mental condition of the wife it would have been competent. (See *Commercial Travelers v. Barnes*, 75 Kan. 720, 90 Pac. 293.)

The next error of which defendant complains is the admission of the evidence of an insurance man. He was called and testified that he used the American experience tables of mortality and had a table with him. He was asked the following question:

"Q. I will ask you to refer to that table and tell us the life expectancy of a woman forty-seven years of age, as based on this table."

Over objection, the witness was permitted to answer. The argument of defendant is that the experience table is based on insurable lives and that the table would not apply to a woman whose physical condition was that of Mrs. Linscott before her operation. This court decided the question contrary to the contentions of defendant in *Whetstine v. Atchison, T. & S. F. Rly. Co.*, 134 Kan. 509, 180 Pac. 193.

The next error urged by defendant concerns the propounding of a hypothetical question to certain doctor witnesses. Several reasons are urged why this question was inadmissible. The first two are that the question was encumbered with immaterial facts and was complex and confusing. The immaterial facts with which defendant claims the question was encumbered relate to the weight and height of the patient, medicine given and time of taking, character of work, long period of suffering, bedwetting, drainage of urine, loss of weight, decline in strength, lack of control over urine, inclination to self-destruction and inability to work. These facts are all pointed out by defendant in his brief in this court, and it is urged that they were so immaterial that inclusion of them made the question objectionable. It might be said in passing that when objection to the question was made in the trial court only one or two particular facts were pointed out and these were eliminated from the question. The rule is that an objection to a hypothetical question on this ground will not be considered unless the particular ground upon which the objection is urged was brought to the attention of the trial court. (See *Roark v. Greeno*, 61 Kan. 299, 59 Pac. 655; also, *Nangle v. Packing Co.*, 112 Kan. 289, 212 Pac. 108.) Even though this were not the rule we are unable to see where this question is so encumbered with immaterial facts or so complex and confusing as to prejudice defendant.

Defendant next argues that the question was objectionable because it assumed facts not supported by the evidence. Several statements from the question are pointed out, and it is argued that the evidence does not support them. An examination of the record

discloses that these statements are all supported by the record, keeping in mind the rule that a hypothetical question may be based upon facts which the testimony tends to prove. (See *Medill v. Snyder*, 61 Kan. 15, 58 Pac. 962. See, also, *Dilleber v. Home Life Insurance Company*, 87 N. Y. 79.)

Defendant next urges that the question entrenched upon the province of the jury. The argument is that the doctor witnesses were permitted to state that defendant was negligent. An examination of the record does not substantiate this argument. The doctors were asked the following question:

"Q. Now, Doctor, basing your answer again on the facts assumed in this hypothetical question, do you have an opinion as to whether the surgeon who performed the three operations on the woman described in this question with the results described, the continual drainage of the urine after the third operation to the present time, whether he used the ordinary skill and care which surgeons practicing in this vicinity use in like operations?"

The answers were, "Well, with these assumptions he did not." This is not a statement that defendant was negligent. It is a statement of fact from which the jury might find negligence. It was the proper way to frame a hypothetical question. (See *Commercial Travelers v. Barnes*, 75 Kan. 720, supra; *Sly v. Powell*, 87 Kan. 142, 123 Pac. 881; *Updegraff v. Gage-Hall Clinic*, 125 Kan. 518, 264 Pac. 1078; *Shouse v. Consolidated Flour Mills Co.*, 132 Kan. 108, 294 Pac. 657, and *Bell v. Newkirk*, 136 Kan. 111, 12 P. 2d 733.)

Defendant next argues that the question was objectionable because it assumed as true material disputed facts. An examination of the record discloses that the circumstantial evidence, together with the direct evidence and admissions of defendant, tended to prove every fact included in the question. If there was any evidence from either side tending to establish on any reasonable theory the facts included in the question, then the question was not objectionable on this ground. Such is the case here.

We see no merit in the contention of defendant that the hypothetical question was objectionable on account of its form.

Defendant next argues that the trial court committed error in permitting certain questions to be asked the defendant. The defendant testified as follows:

"Q. Why didn't she have the operation at that time? A. Why?
"Q. Yes. A. I don't know.
"Q. She told you she didn't have the money, but as soon as she got the

money she would follow your advice? A. I don't recall that money was the issue at stake."

Again he testified as follows:

"Q. She explained to you that her husband was a tenant farmer and that they had spent all the money they could on the operation and the hospital, and it was necessary for her to go home because they could not afford to keep her in the hospital any longer. A. I don't recall of that statement being made."

Defendant argues that these questions and answers prejudiced the jury against him and did not tend to prove or disprove any issue in the case. It is not plain that these questions were asked for the purpose of disclosing the financial condition of plaintiff. With the wide latitude and discretion that the trial courts have in the matter of permitting cross-examination we see no error in this testimony.

The defendant next argues that his demurrer to the evidence of plaintiff should have been sustained. The argument is that there was no competent substantial evidence to prove the negligence and carelessness of plaintiff. In the consideration of this question the defendant did not stand on his demurrer. We must consider not only the evidence of plaintiff but also any evidence of defendant that tended to supply any deficiency in the evidence of plaintiff. (See *Railway Co. v. Bentley*, 78 Kan. 221, 93 Pac. 150; also, *McPherson County v. Railroad Co.*, 110 Kan. 274, 203 Pac. 912.)

There is ample evidence here that Mrs. Linscott had control of her urine when she submitted to the operation. The same may be said of her lack of control immediately after the first operation. Indeed, this is a fair inference to be drawn from the evidence of defendant himself. The defendant admitted that some time after the first operation Mrs. Linscott had a fistulous tract leading from the ureter down to the crevice and out into the vagina, and that the abnormal drainage of urine was caused by the fistula or abnormal opening in the left ureter, and then the urine went out through that abnormal opening down the fistulous tract into the crevice and then out into the vagina without control. It would add nothing to this opinion to detail the evidence of plaintiff here. Suffice it to say that with the evidence of the doctors and the circumstances heretofore mentioned there was ample evidence to warrant the submission of the issues of negligence to the jury and to sustain the verdict. In this connection it might be observed that the defendant and his assistant testified that the operation was hastened somewhat on account of an unusual hemorrhage. On disputed evidence the jury

found that there was no such hemorrhage. In testifying with reference to this hemorrhage the defendant would not deny that he injured the ureter in his efforts to stop the bleeding. He would only say he did not know. This was a circumstance which may have been given considerable weight by the jury.

This court has considered similar cases. In *Sexton v. Deiter*, 87 Kan. 175, 123 Pac. 768, this court said:

"The plaintiff was uninjured before taking the anæsthetic. As soon as she became conscious again she found that she had been burned. She could not burn herself, and there was evidence that the defendant's assistant did not burn her. Nobody else except the defendant had an opportunity to do so. The defendant admitted on separate occasions that he inflicted the wound, and the circumstances all indicated that he must have done so. Therefore the plaintiff's evidence established a *prima facie* case. Whether the *prima facie* case was overcome by the evidence upon which the defendant relies was a matter for the jury to determine."

See, also, *McMillen v. Foncannon*, 127 Kan. 573, 274 Pac. 237; *Nance v. Beatie*, 127 Kan. 505, 274 Pac. 219; *Rainey v. Smith*, 109 Kan. 692, 201 Pac. 1106.

The defendant next argues that the court erred in refusing to permit certain witnesses to testify. Dr. John Chapman and Dr. Eugene Aten were offered as witnesses, and an objection to their testimony was sustained on the ground of privilege. It will be remembered that this action was filed December 3, 1932. Mrs. Linscott was found to be insane and committed to the state hospital at Osawatomie December 20, 1932. A new petition in the name of Mr. Linscott, as guardian, was filed December 20, 1932, and Mrs. Linscott was discharged from the hospital March 16, 1933. The affidavit of Doctor Aten was produced at the motion for a new trial. In that affidavit he stated that he is a member of the medical staff of the Kansas state hospital at Osawatomie; that Martha Linscott was admitted to the hospital on December 21, 1932, where she continuously remained until she was discharged on March 16, 1933; that she was under the charge of Doctor Aten during her confinement in the state hospital and he saw her practically every day, made several physical examinations and found her to be suffering from neurosis, complicated with an exophthalmic goiter, which was the cause of her being admitted; that he found she had incontinence of urine, which, in his opinion, was due to her mental disease; found no evidence of fistula or opening into the urinary tract other than the normal channel, and

that after several weeks, to make sure of this conclusion, he gave her by the mouth every three hours for one day, five grains of methylene blue, which is excreted by the urine in a deep blue color; that he found no evidence of this methylene blue in the vagina and it was all passed normally through the urethra; that a month before she left the hospital she was controlling her urine during the night, but had occasional dribbling during the day; that after one week this incontinence ceased entirely, and at the time she left the hospital she had complete control of her urine; that at no time during her stay in the hospital did urine escape into or through the vaginal canal except during the early stages of her confinement, when the urine which came out of the urethra in its natural channel spread into the vagina; that he had the operation performed by the defendant explained to him in detail, and, from this explanation and his examination and observation of Martha Linscott, it was his opinion that the operations were not the direct or proximate cause of her insanity; that there was a disposition to insanity in her family; that Fred Linscott talked with him at the hospital and claimed that urine was escaping into the vaginal canal, and that he told him he was mistaken about this as he had examined her and had made the methylene blue test and that urine was not escaping into the vaginal canal, and that her incontinence was entirely due to her lack of conscious control of the sphincter muscle.

The trial court refused to admit this evidence because of R. S. 60-2805, which provides:

"The following persons shall be incompetent to testify:

*"Sixth.* A physician or surgeon concerning any communication made to him by his patient with reference to any physical or supposed physical disease, defect, or injury, or the time, manner or circumstances under which the ailment was incurred, or concerning any knowledge obtained by a personal examination of any such patient, without the consent of the patient."

Defendant argues that this was error because the relation of surgeon and patient did not exist in this case; that her treatment and condition as an inmate of the state hospital is open to public inquiry, and that she and the plaintiff waived the privilege, if any existed. The theory of defendant on the first ground is that the relation of physician and patient springs from contract and that the entry of Mrs. Linscott into the state hospital was an involuntary act and did not arise from contract. Hence, the relationship of physician and patient could not arise from it.

At the outset of this discussion it should be stated that defendant could not have been prejudiced by the refusal to admit this testimony in view of the fact that plaintiff asked that a commission of doctors be appointed by the court to examine Mrs. Linscott for the purpose of advising the jury as to just what her condition was. Objection to the appointment of such a commission was made by the defendant and sustained by the court.

The great weight of authority, moreover, is to the effect that the fact of the patient being an inmate of an asylum or hospital does not deprive the patient of the protection of the statute. In 28 R. C. L. 534 the rule is stated as follows:

"Furthermore, it is the consensus of judicial opinion that the records of a hospital or asylum, when offered in evidence against a patient or his privy in interest, are inadmissible, being within statutes making a physician incompetent to testify regarding matters of which he acquires knowledge while acting in his professional capacity. The introduction of the records would obviously be an evasion of such statutes; for though the physician would not actually testify, yet the privileged matter sought to be barred would in fact be effectually placed in evidence."

Again, at 28 R. C. L. 540, it is said:

"It is not necessary, in order that matter communicated to a physician be held privileged, that the physician be employed by the patient. On the contrary the rule seems to be that so long as the physician acted in a professional capacity, and obtained information for the purpose of prescribing for the patient in that capacity, the matter is privileged, regardless of who employed him or how he came into the case. Thus, the privilege attaches as well when the information is acquired from a pay patient in a private residence or hospital, as from a charity patient in a public hospital, and a physician who is rightfully in a hospital exercising authority over the patients, examining their persons, advising treatment, and removing patients from their wards to the operating room for clinical purposes, with the knowledge of those in charge of the institution, is incompetent to testify as to the results of an examination made by him of a patient. So a public official, who, as a physician or surgeon, learns in that capacity information concerning a patient committed to his care, will not be permitted to impart it to anyone unless by consent of the patient."

See, also, 40 Cyc. 2382 *et seq.*

This question was considered in the case of *Casson v. Schoenfeld*, 166 Wis. 401, where the Wisconsin statute (§ 4075), which is similar to our statute (R. S. 60-2805), was construed, and the court held:

"Attendant at state hospital for insane, whose duty, under St. 1915, sec. 561q., was to examine and attend patients, was incompetent under St. 1915, sec. 4075, prohibiting physicians from disclosing information acquired in a professional character, to testify to mental derangement of plaintiff, in action for fraud in exchange of properties." (166 N. W. 23.)

In the opinion the court stated that the witness, an examining physician at the state hospital for the insane, was permitted to testify to an examination he had made of a patient who had been committed to the institution. The court held the case came within the provisions of section 4075, and required the exclusion of the testimony of the doctor. The court held that a statute requiring the filing of a daily record of each patient was not to be interpreted as a legislative declaration that the duty of secrecy imposed on physicians by section 4075 had been relaxed.

The case of *Smart v. Kansas City*, 208 Mo. 162, 105 S. W. 709, discusses the contract theory that is advanced by defendant. In that case a woman was hurt in an accident and was taken to a hospital, where her leg was amputated. When she sued the city the court held that the physicians and surgeons in the hospital where she was taken were incompetent to testify against her. The court said:

"The relation of physician and patient is one of contract, either expressed or implied, and can be created in no other way. In cases of this character the physician or surgeon in accepting such a position impliedly, at least, agrees to treat such patients as are accepted into the institution, and when he assumes to examine them either by their express agreement, or by their implied or tacit consent, which may be inferred from the act of entrance into the institution, and which will be inferred in the absence of evidence indicating a contrary intention in either event, whenever the minds of the physician and patient meet by either express or implied contract, the statute places the seal of secrecy upon all information acquired by the physician in such professional capacity.

"The same rule of law applies as fully and effectually to the assistant physician and surgeon in chief. . . .

"The rule has also been applied to the partner of the attending physician, even though the partner never prescribed for the patient. (*Raymond v. Railroad*, 65 Ia. 152; *Ætna Life Ins. Co. v. Deming*, 123 Ind. 384.)

"It makes no difference in principle, so far as the physician's disqualification is concerned, whether he acquires the confidential communications from a poor or pay patient, in a private residence or hospital, or from a charity patient in a public hospital.

"The same statute disqualifies an attorney from divulging the confidential communications between himself and his client, and it makes no difference whether the client is poor or rich, nor whether he lives in a palace or in a poor house—the same rule applies in both cases. The poor and needy are as much protected by the law as the rich and strong. Certainly the statute makes no such distinction or exception, and we do not feel justified to write such exceptions into the statute." (p. 189.)

See, also, *Massachusetts Mut. Ins. Co. v. Trustees*, 178 Mich. 193, 144 N. W. 538. What has been said on this question applies equally

as well to the argument of defendant that the evidence should have been admitted because her treatment and condition as an inmate of the state hospital is open to public inquiry.

Defendant next argues that plaintiff and Mrs. Linscott waived the privilege, if any existed. He bases this argument on the fact that plaintiff testified all about the condition of his wife, about her operations and about her mental condition so that there was no longer any necessity for secrecy. He cites and relies on *Armstrong v. Street Railway Co.*, 93 Kan. 493, 144 Pac. 847, where the plaintiff had testified about the very things concerning which he sought to prevent the doctors from testifying. The court held that by so testifying he had waived the privilege. In this case, as in the others relied on by plaintiff, the person who endeavored to keep the evidence of doctors from the jury had testified about the very transactions concerning which inquiry was made of the doctors. In the case at bar neither Mr. nor Mrs. Linscott had testified about anything that happened at the state hospital. Beyond a statement in the hypothetical question, that Mrs. Linscott had been confined in the state hospital, there is nothing in the record about it. The subject is dealt with in the case of *Metropolitan St. Ry. Co. v. Jacobi*, 112 Fed. 924. There the court held:

"Under the provisions of Code Civil Procedure N. Y., section 834, which make incompetent the testimony of a physician as to information acquired while attending a patient, and of section 836, which permits such information to be disclosed only when the provisions of section 834 'are expressly waived upon the trial . . . by the patient,' as such provisions have been construed by the supreme court of the state, the fact that a plaintiff in an action for personal injuries introduces the testimony of physicians who attended him, in respect to the nature and extent of such injuries, does not operate as a waiver of the right to object to the testimony of another physician, called by defendant, who had attended him for the *same injuries, but at a different time.*"

See *Citizens St. Ry. Co. v. Shepherd*, 30 Ind. App. 193, 65 N. E. 765, and cases there cited. Of like import is *May v. Northern Pac. Ry. Co.*, 32 Mont. 522, 81 Pac. 328. See, also, *Hirschberg v. Southern Pac. Co.*, 180 Cal. 774, 183 Pac. 141, and *Rost v. Heyka*, 130 Kan. 5, 285 Pac. 539.

Defendant next argues that certain instructions should have been given. The first one of which he complains is the refusal of the court to instruct the jury to return a verdict for the defendant. That instruction was properly refused for the reasons heretofore stated in this opinion.

Defendant next argues that requested instructions 4 and 8 should have been given. Number 4 contained a general definition of negligence. Number 8 defined negligence as failure to exercise the care of a prudent man, discussed proximate cause and set out a test for determining when an act is the proximate cause of injury.

Without quoting all the instructions that were given by the trial court we have reached the conclusion that the subject of negligence was adequately and fairly treated in the instructions that were given.

Requested instruction No. 9 states to the jury that a surgeon does not warrant that he will restore the patient to his former condition. This instruction was properly refused because there was no evidence to warrant it. Plaintiff is not contending that defendant is liable because he warranted a cure.

Requested instruction No. 11 instructs the jury that defects or bad results appearing or resulting from an operation is no evidence of negligence or lack of care, and that the surgeon is not an insurer. The instruction was properly refused. The facts did not justify any such instruction.

Requested instruction No. 14 was as follows:

"A physician or surgeon cannot be held liable for the results of an honest error in judgment if it appears from the evidence that he possesses a reasonable degree of skill and learning in medicine and surgery. ·It is incumbent upon the plaintiff and the burden rests upon her to prove that he did not possess ordinary skill and care, or that he was negligent and careless."

This instruction was properly refused. There is no testimony by either side that the condition of Mrs. Linscott was caused by an error in judgment. Defendant testified about the exercise of judgment when the hemorrhage occurred but did not testify that the thing that caused Mrs. Linscott's trouble was caused by something done in the exercise of judgment.

Requested instruction No. 27 was to the effect that if the jury believed that had Mrs. Linscott promptly submitted to an operation the escape of urine could have been prevented then she could not recover damages from defendant. This instruction is fully and fairly covered by instructions Nos. 12 and 13, where the court instructed the jury that if they believed from the evidence that if Mrs. Linscott had remained in the hospital for a reasonable time the escape of the urine would have been prevented she could not recover damages suffered thereafter, and that one suing for damages caused by

the negligence of another must do whatever he can to mitigate the damages resulting from the act.

Defendant next argues that the court committed error in the instructions that were given.

Our attention is directed to instruction No. 2. This is a general definition of negligence. It is as follows:

"You are instructed that negligence is defined to be the failure to observe, for the protection and interests of another person, that degree of care, caution and vigilance which the circumstances justly demand, whereby such other person suffers injury."

Defendant argues that in this instruction too much was left to the jury. If this was a defect it was amply cared for by instructions 4, 5 and 6.

Defendant complains of instruction No. 6. In that instruction the jury was told that in order to make negligence the direct and proximate cause of any injury there must have been some connection between the negligent act and the injury. The objection urged to the instruction is that no negligent act was proved to provide a basis for the instruction. That argument merely raises a question that has been settled heretofore in this opinion.

Defendant next argues that the giving of instruction No. 7 is error because it does not correctly state the law and does not fully state the law as to hypothetical questions. The instruction is as follows:

"You are instructed that in this case questions have been submitted to certain members of the medical profession, which questions are known in the law as 'hypothetical questions.' You are instructed that such questions are proper questions and that you should consider these questions and the answers made to them like other testimony tried by the same tests, and are entitled to receive such weight and credit as you deem such testimony fairly entitled to when viewed in connection with all the other testimony in this case."

The argument of defendant is that the jury should have been instructed that they were not to find the verdict upon the opinion expressed by the expert. Defendant argues that it is the duty of the jury to determine first, whether the facts included within the hypothetical question are true; and, if true, the verdict may be based upon the opinion expressed by the expert upon these facts.

Plaintiff points out instruction No. 20. It is as follows:

"Certain members of the medical profession have testified and given their opinions as witnesses in the case. For the purpose of this case these witnesses are termed experts, presumed to have special knowledge with reference to the

matters concerning which they have testified. The opinions of these witnesses are to be considered like other testimony tried by the same tests, and entitled to receive such weight and credit as you deem such testimony fairly entitled to when viewed in connection with all of the other testimony in the case."

When that instruction is considered in connection with No. 7, the two, taken together, comply substantially with the requirements urged by defendant.

Defendant objects to No. 15 because it contained the following phrase:

"Although you may believe the defendant to have possessed all the qualifications necessary to a competent and skillful physician and surgeon."

It does not appear that the quoted phrase was prejudicial to defendant.

Defendant objects to instruction No. 17 because the jury were instructed that if they believed from the evidence that had the defendant followed the proper and approved methods recognized by his profession, that no injury would have been inflicted upon the left ureter, they would be justified in forming a conclusion as to whether the defendant used proper care and skill in the operation.

There was ample evidence in the record to warrant the giving of this instruction.

Defendant urges that instruction No. 18 was erroneous. That instruction is as follows:

"I further instruct you that if a person holds himself out to the public as a physician and surgeon, he must be held to possess and exercise ordinary skill, knowledge and care in his profession. And where an injury results from a want of ordinary skill or attention in an operation, the physician or surgeon is held responsible for such injury. You should notice I have said the physician should exercise the ordinary skill, knowledge and care required of men in his profession in his work. The physician is not required to possess or exercise the highest degree of care and skill known to the profession in order to relieve him from liability; only reasonable care and skill is required; that is, such care and skill as is possessed by men of his profession in general, and I will add to that at least the average degree of knowledge and skill possessed and executed by the members of his profession generally in the locality in which he practices. If the defendant did not use such ordinary care and skill in his operation on said Martha Linscott as I have defined to you, he would be guilty of negligence, and if damage resulted therefrom without fault or negligence on the part of the said Martha Linscott, the plaintiff would be entitled to a verdict at your hands. Should the evidence fail to show the defendant did not exercise ordinary care and skill in his work and operation on said Martha Linscott, then he would not be guilty of any negligence, and your verdict should be for the defendant."

Defendant argues that the statement is an abstract statement of law quite meaningless to a jury of laymen. When this instruction is considered in conjunction with instructions defining the issues and the other instructions the meaning is plain and the instruction is correct. The argument of defendant that the latter part of this instruction is intended to indicate that the court is of the opinion that plaintiff should prevail is without foundation.

The defendant next argues that the court failed to instruct upon all the issues in the case. The point urged is that the court should have instructed upon the value of mortality tables. The court did instruct that the jury should consider all the evidence offered together. We do not consider that the use of the mortality tables required a special instruction.

Defendant urges error in the refusal to strike answers of the jury to certain questions.

One of these was the answer "No hemorrhage occurred during the first operation." This question was answered on conflicting evidence and it would have been error to strike it.

The next question and answer which defendant wanted stricken out was No. 2. That is where the jury finds defendant did not believe that the hemorrhage was so severe as to endanger Mrs. Linscott's life. This question was also answered on conflicting evidence and will not be disturbed.

In special finding No. 6 the jury found that Mrs. Linscott did not refuse to remain longer in the hospital on May 8. This finding is amply supported by the evidence.

Defendant argues that the court erred in overruling defendant's motion for judgment. That motion is based upon the following question and answer of the jury:

"Q. 3. If you find for the plaintiff, in what respects was defendant negligent? A. Negligently and carelessly caused a laceration or injury to the left ureter."

The argument of defendant is that the answer is a mere conclusion of law and not a finding of negligence. We cannot agree with that contention. The evidence is that he made a hole in the left ureter and that this was due to negligence.

Defendant next argues that the court erred in overruling the motion for a new trial. Under this head defendant points out that one of the jurors testified orally upon the motion for a new trial, as follows:

"Q. Was this verdict your verdict and were the answers to the special questions your answers? A. Not according to my judgment."

The trial court heard this oral evidence and read numerous affidavits of other jurors and decided, following numerous authorities of this court, that the juror should not be allowed to impeach his own verdict.

Defendant next argues that a new trial should have been called because a juror made an affidavit that another juror made the remark that she understood from a statement of counsel for plaintiff that doctors carried insurance to cover such cases. There is nothing in the record indicating that counsel ever made such a remark. The juror made two or three conflicting affidavits. The trial court heard all the affidavits and concluded that it did not constitute grounds for a new trial. This holding will not be disturbed.

Defendant next argues that there was misconduct on the part of counsel for plaintiff. This claim is based on the fact that on the occasion of a rainy day the wife of one of counsel took a member of the jury from the courthouse to a lunchroom. This was explained to the evident satisfaction of the trial court. The next objection is that the verdict is contrary to the law and the evidence. This point has been fully covered heretofore in this opinion.

Defendant argues that the verdict is excessive. Considering the evidence as to the condition of this woman and what she has endured we cannot agree with this.

Under the head of newly discovered evidence defendant asked a new trial because he had just discovered that the probate judge of Montgomery county would testify that the daughter of Mrs. Linscott was found insane and sent to Osawatomie in July, 1929. The probate judge would also testify that some time after the first operation Mr. Linscott told her he thought his wife was crazy. Mr. Linscott answered the affidavit of the probate judge by an affidavit that he had at no time ever discussed his wife's mental condition with the official. The trial court examined these affidavits and concluded that the situation was not one to warrant the granting of a new trial. The argument for a new trial consumed about eight hours. During that time counsel for defendant insists that counsel for plaintiff admitted that Mrs. Linscott was sane.

The court took the affidavit of everyone present on this point and concluded that the remark was not made. The finding will not be disturbed.

From what has been said, it is concluded that no error appears in the record and the judgment is affirmed.

HARVEY, J. (concurring specially): I concur in the order affirming the judgment, but do not give my consent to the ninth paragraph of the syllabus and the treatment of that question in the opinion. It is my judgment that there were other reasons which justified the trial court's rulings.